IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MELISSA SAGER,

    *Plaintiff*,

v.

HOUSING COMMISSION OF ANNE
ARUNDEL COUNTY, *et al.*,

    *Defendants*.

Civil Action No. ELH-11-2631

## MEMORANDUM OPINION

Melissa Sager, plaintiff, resides in an apartment that is owned and operated by the Housing Commission of Anne Arundel County (the "Commission" or "HCAAC"), as part of the federal public housing program. *See* 42 U.S.C. §§ 1437 *et seq.*; 24 C.F.R. ch. IX. She has sued the Commission; its executive director, Clifton Martin; and the Commission's senior property manager, Diana Flynn, defendants, alleging violations of federal and Maryland law.[1]

Count I of the Complaint (ECF 2) alleges violations of the Maryland Consumer Protection Act ("CPA"), Md. Code (2005 Repl. Vol., 2011 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L."), which bars "unfair or deceptive trade practices." C.L. § 13-301. Count II asserts a violation of Md. Code (2010 Repl. Vol., 2011 Supp.), § 8-208(d)(1) of the Real Property Article ("R.P."), which prohibits the inclusion in a residential lease of any provision authorizing a confessed judgment against the tenant. Count III claims several violations of the United States Housing Act, 42 U.S.C. §§ 1437 *et seq.*, and its implementing

---

[1] Plaintiff initiated her lawsuit in the Circuit Court for Anne Arundel County, Maryland. Defendants timely removed the case to federal court on the basis of federal question jurisdiction. *See* Notice of Removal (ECF 1); 28 U.S.C. §§ 1331, 1441. The Court has supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367.

Mr. Martin and Ms. Flynn are sued only in their official capacities. *See* Complaint ¶¶ 3-4 (ECF 2). Unless otherwise noted, I will refer to all defendants collectively as the "Commission" or "HCAAC."

federal regulations, governing the operation of public housing.  In Count IV, plaintiff alleges discrimination in housing on the basis of disability, in violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq*.   And, in Count V, she claims deprivation of due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.  According to the Complaint, "[e]nforcement of rights conferred by federal law is sought under 42 U.S.C. § 1983."   Complaint ¶ 5.   Plaintiff seeks a declaratory judgment pronouncing that various practices of defendants are unlawful; damages of $648.36, trebled to $1,945.08, for sums allegedly collected by the Commission under illegal lease provisions; and $10,000 in damages for "emotional distress and mental anguish."  Complaint at 16.

 Defendants have filed a "Motion to Dismiss or in the Alternative Motion for Summary Judgment" (ECF 8), as well as a supporting memorandum (ECF 8-1) (collectively, "Motion"), to which plaintiff has filed an opposition (ECF 9) and a supporting memorandum (ECF 10) (collectively, "Opposition" or "Opp.").   After the Court directed the parties to address whether the Court should abstain from exercising jurisdiction (ECF 11), defendants filed a Reply (ECF 12), and, by leave of Court, *see* Local Rule 105.2(a), plaintiff filed a Surreply (ECF 13).

No hearing is necessary to resolve the issues presented.  *See* Local Rule 105.6.  For the reasons that follow, the Court will not abstain from exercising jurisdiction at this juncture, and defendants' Motion will be granted in part and denied in part.

**Background**

A.  The Commission and the Public Housing Program

The Housing Commission of Anne Arundel County is a public housing agency ("PHA") that operates federally subsidized public housing.   The Commission is recognized under Maryland state law as a "public body corporate and politic," pursuant to Md. Code (2006, 2011

Supp.), § 14-102 of the Housing and Community Development Article ("H.C."), and is the state-designated "housing authority" for Anne Arundel County under Title 12 of the H.C. Article. *See* H.C. §§ 12-101 *et seq.* (providing for a housing authority in each political subdivision of Maryland, and establishing requirements for housing authorities generally); H.C. § 14-101 (providing that Title 12 of the H.C. Article applies to the HCAAC); *see also* Anne Arundel County Code (2005, Dec. 2011 Supp.), §§ 3-4-101 *et seq.* (authorizing HCAAC to function in the County, under designation of "Housing Authority"); H.C. § 14-101 (recognizing name change of HCAAC from "Authority" to "Commission").

The federal public housing program is authorized by the United States Housing Act of 1937, codified, as amended, at 42 U.S.C. §§ 1437 *et seq.* Under the public housing program, the United States Department of Housing and Urban Development ("HUD") provides operating subsidies to local PHAs, such as the Commission, which own and operate housing for eligible low-income families and individuals. *See* 42 U.S.C. § 1437a(b)(6) (defining "public housing agency" for purposes of the public housing program as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing"). Tenants of public housing pay their PHAs monthly rent that is substantially below the cost of rental housing in the open market. *See generally* 42 U.S.C. § 1437a(a) (establishing income eligibility standards and methods of rent calculation for residents of public housing); 24 C.F.R. part 960 (same).

The operation of public housing by PHAs is subject to comprehensive federal regulation. Among other things, federal law dictates much of the content of public housing leases, requiring the inclusion of various provisions and prohibiting other provisions. *See* 42 U.S.C. § 1437d(*l*); 24 C.F.R. part 966, subpart A. In general, PHAs are prohibited from including "unreasonable

terms and conditions" in public housing leases.   42 U.S.C. § 1437d(*l*)(2).   Federal law also imposes eligibility requirements, both financial and otherwise, for admission to and continued residence in public housing.   *See* 24 C.F.R. part 960, subparts A & B.   Moreover, each PHA is required to promulgate an Admissions and Continued Occupancy Policy, which must set forth the agency's policies regarding operation of its public housing units, and which must be approved by HUD in the course of its review of the PHA's Annual Plan.   *See* 42 U.S.C. § 1437c-1(d)(3)-(6), (12)-(15); 24 C.F.R. § 903.7(b), (e)-(f), (*l*)-(n).   *See also* 76 Fed. Reg. 51049, 51050 (Aug. 17, 2011) ("PHAs must develop and keep on file the admission and continued occupancy policies and include this information in their Administrative Plan.").

Leases in public housing are "automatically renewed" on an annual basis, 42 U.S.C. § 1437d(*l*)(1), and cannot be terminated by a PHA except for "serious or repeated violation of the terms or conditions of the lease or for other good cause."   *Id.* § 1437d(*l*)(5); *see also* 24 C.F.R. § 966.4(a)(2), (*l*)(2).   The right of a public housing tenant to remain in his or her housing is "entitled to due process protection."   *Caulder v. Durham Hous. Auth.*, 433 F.2d 998, 1003 (4th Cir. 1970) (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)), *cert. denied*, 401 U.S. 1003 (1971); *see also Carroll v. Hous. Opportunities Comm'n of Montgomery County*, 306 Md. 515, 525, 510 A.2d 540, 545 (1986) (holding that resident of public housing "has a right to remain in her townhouse indefinitely until the [PHA] can establish good cause for eviction").   Except in cases of eviction for certain types of dangerous or drug-related criminal activity, federal law requires a PHA that intends to terminate a tenant's lease to afford the tenant an opportunity for a hearing, pursuant to grievance procedures that each PHA must adopt.   *See* 42 U.S.C. § 1437d(k); 24 C.F.R. §§ 966.4(*l*)(3), 966.51(a)(2).

The grievance procedures apply not only to lease terminations, but also to any other "dispute which a tenant may have with respect to PHA action or failure to act in accordance with the individual tenant's lease or PHA regulations which adversely affect the individual tenant's rights, duties, welfare or status." 24 C.F.R. § 966.53(a); *see also* 42 U.S.C. § 1437d(k). Federal regulations permit each PHA to craft its own procedures for hearing of grievances within certain parameters, including the requirement that the PHA provide an opportunity for "[i]nformal settlement of grievances," 24 C.F.R. § 966.54, followed by the opportunity for a more formal hearing, "if the complainant is not satisfied." *Id.*; *see* 24 C.F.R. §§ 966.55, 966.56, 966.57 (regulations governing procedures for formal hearing of grievances).

### B.  Plaintiff's Tenancy[2]

#### 1.  Plaintiff and Her Lease

On or about May 17, 2010, Ms. Sager entered into a lease agreement with the Commission for premises located at 7849 Crilley Road, Apt. 500, Glen Burnie, Maryland (the "Property").  *See* Complaint ¶ 8; *see also* Residential Lease Agreement ("Lease") (ECF 8-5 at 6), Ex.H to Affidavit of Clifton Martin ("Martin Aff."), Ex.3 to Motion (ECF 8-4 & 8-5).[3]  The

---

[2] The facts presented in this section are drawn from plaintiff's Complaint and its attached exhibits, as well as certain documents submitted by defendants that are "'integral to and explicitly relied on in the complaint,'" the authenticity of which has not been challenged. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (discussing evidence that may be considered in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6)) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  To the extent that the evidence is in dispute or defendants have presented evidence beyond what is appropriate for consideration in the context of a motion to dismiss, those facts are not presented in this section, unless otherwise noted.  I will take up any factual disputes and additional evidence, to the extent necessary, in the Discussion.

[3] The Lease identifies plaintiff as "Melissa Welborn-Sager."  Lease at 1.  Although plaintiff did not attach a copy of the Lease to her Complaint, the Complaint quotes from the Lease at length, and several of plaintiff's claims concern a particular provision of the Lease.  A copy of the Lease was submitted by defendants as an exhibit to an affidavit filed with their Motion, and plaintiff has not disputed its authenticity.  Accordingly, I may consider the Lease as

Property is an efficiency apartment in Pinewood Village, one of the public housing apartment complexes operated by the Commission that is specifically designated for persons who are elderly or have a disability.  Complaint ¶¶ 1, 58; *see also* 42 U.S.C. § 1437e (providing for designation of public housing projects for occupancy by elderly persons and/or persons with disabilities); 24 C.F.R. part 945 (implementing regulations for 42 U.S.C. § 1437e).  Born in 1956, Ms. Sager was 53 at the time she entered into the Lease.  *See* Lease at 1.  Therefore, Ms. Sager is not "elderly" within the meaning of applicable law, which defines an "elderly person" as one who is at least 62 years of age.  42 U.S.C. § 1437a(b)(3)(D).[4]  According to the Complaint, plaintiff is a "person with disabilities," Complaint ¶ 1, although her disabilities are described only as "mental health disabilities," without further detail.  *Id.* ¶ 16.

Ms. Sager is obligated under the Lease to pay rent of $192 per month, due on the first day of each month.  *Id.*, § II.B, at 1.  She is also "responsible for the payment of certain other charges specified in this lease," including "late charges" equal to the lesser of $10 or 5% of the monthly rent for any rent payment made after the tenth day of a given month, and "maintenance costs" for services or damages beyond normal wear and tear.  *Id.*, § III.A-D, at 2.  The Lease requires the Commission to provide written notice of the amount and due date of "other charges," and provides that such charges may be due "no sooner than two weeks after Tenant receives the PHA's written notice of the charge."  *Id.*, § III, at 2.  Further, the Lease states, *id.*:

> Any payment by the Tenant to the Landlord under this Lease which is not specifically designated, in written notation, as "rent" or "for rent", may be applied

---

a document "'integral to and explicitly relied on in the complaint,'" even if the Motion is treated as a motion to dismiss.  *E.I. du Pont*, *supra*, 637 F.3d at 448 (citation omitted).

[4] Ms. Sager qualifies as a "near-elderly person," because she is at least 50 years of age but below the age of 62.  *Id.* § 1437a(b)(3)(G).  "Near-elderly persons" are eligible to reside in housing designated for the elderly if the PHA "determines that there are insufficient numbers of elderly families to fill all the units in a project" designated for elderly occupancy.  *Id.* § 1437e(a)(3).

at the Landlord's option, as follows: first to outstanding maintenance charges and/or late fees and/or legal fees[5] and secondly to rent.

The Lease contains detailed provisions concerning termination.  It specifies that the "Lease may be terminated only for serious or repeated violations of material terms of the Lease." Lease § XIII.A, at 8.  Under the Lease, the Commission is required to "give written notice of the proposed termination of the Lease" in the following time frames: (1) "14 days in the case of failure to pay rent"; (2) a "reasonable time, but not to exceed thirty days, considering the seriousness of the situation when the health or safety of other Tenants or PHA staff is threatened"; or (3) "30 days in any other case." *Id.*, § XIII.B, at 8.  The Lease also enumerates several requirements for any notice of termination, including the following, *id.*, § XIII.C, at 8-9:

1. The notice of termination to Tenant shall state specific reasons for the termination, shall inform Tenant of his/her right to make such reply as he/she may wish, and of Tenant's right to examine PHA documents directly relevant to the termination or eviction.

2. When the PHA is required to offer Tenant the opportunity for a grievance hearing, the notice shall also inform Tenant of the right to request such a hearing in accordance with the PHA's Grievance Procedures.

    \*    \*    \*

4. When the PHA is required to offer Tenant the opportunity for a grievance hearing under the PHA's Grievance Procedure for a grievance concerning the Lease termination, the tenancy shall not terminate (even if any Notice to Vacate under State or local law has expired) until the period to request a hearing has expired, or (if a hearing is requested) the grievance process has been completed.

    \*    \*    \*

6. The PHA may evict Tenant from the unit only by bringing a court action.

---

[5] Despite this reference to "legal fees," the Lease does not contain any provision that expressly authorizes HCAAC to recover attorneys' fees or court costs from the tenant.  However, the Lease does provide that any notice of termination of the Lease sent from the Commission to the tenant must state that, if the tenant does not vacate the rental premises "within the appropriate statutory period, appropriate action will be brought against him, and he may be required to pay the costs of court and attorney's fees." Lease § XIII.C.3, at 8.  This advisement was formerly required by federal regulations, *see* 40 Fed. Reg. 33401, 33408 (Aug. 7, 1975) (enacting 24 C.F.R. § 866.58); *see also* 49 Fed. Reg. 6712, 6714 (Feb. 23, 1984) (redesignating 24 C.F.R. § 866.58 as 24 C.F.R. § 966.58), but was eliminated from the federal regulations in 1991.  *See* 56 Fed. Reg. 51559, 51580 (Oct. 11, 1991) (repealing 24 C.F.R. § 966.58).

2. *The Vacate Agreement, the Grievance Hearings, and the Breach of Lease Case*

Plaintiff claims that, on or about November 8, 2010, the Commission's property manager, Ms. Flynn, induced her to sign a "Vacate Agreement" obligating her to terminate her Lease and vacate the Property, effective as of noon on December 8, 2010. Complaint ¶¶ 9-10; *see also* Vacate Agreement, Ex.1 to Complaint (ECF 2-1). The Vacate Agreement, which was also signed by Ms. Flynn, purported to "satisf[y] the written notice requirement" for termination, contained in the Lease, and stated: "If I [*i.e.*, plaintiff] should violate this agreement, I realize that the Housing Commission will proceeds [sic] with the filing of a PETITION—FOR WARRANT OF RESTITUTION with the Courts to move forward and accomplish the eviction process with the Sheriff." Vacate Agreement at 1. According to the Complaint, Ms. Sager "was not represented by counsel" when she signed the Vacate Agreement. Complaint ¶ 10.

Plaintiff explains the circumstances that led to the execution of the Vacate Agreement by quoting from a "7 page lease termination letter dated November 29, 2010," authored by Ms. Flynn (the "Termination Letter").[6] According to the Complaint, Ms. Flynn "made an unannounced visit to Ms. Sager's unit" on or about November 8, 2010. Complaint ¶ 9. At that time, Ms. Flynn advised Ms. Sager that the Commission "intended to terminate her lease due to 'numerous, serious lease violations,'" and "'informed [Ms. Sager] of the ramifications of not being able to reapply for [public] housing if [her] Lease was terminated.'" *Id.* (quoting

_____

[6] Although the Termination Letter is quoted extensively in the Complaint, plaintiff did not submit a copy of it as an exhibit. However, a copy was attached as an exhibit to a complaint for breach of lease, discussed *infra*, that was filed by the Commission against Ms. Sager on February 16, 2011, in the District Court of Maryland. Defendants have submitted a copy of the complaint for breach of lease and its exhibits, including the Termination Letter, as an exhibit to their Motion. *See* Termination Letter, Unnumbered Ex. to February 2011 Breach of Lease Complaint, Ex.2 to Motion (ECF 8-3). Plaintiff has not disputed the authenticity of the copy of the letter. Because Ms. Flynn's alleged statements in the letter form the basis of part of plaintiff's CPA claim, the Termination Letter is "'integral to and explicitly relied on in the complaint,'" and may be considered, regardless of whether the Motion is treated as a motion to dismiss or one for summary judgment. *E.I. du Pont*, *supra*, 637 F.3d at 448 (citation omitted).

Termination Letter) (some alterations in Complaint).  However, Ms. Flynn suggested to plaintiff that she "'could agree to consent to move instead,'" and thereby preserve her ability to "'reapply'" for housing with the Commission "'once [she was] capable of meeting [her] Lease requirements.'"  *Id.* (quoting Termination Letter at 5) (alterations in Complaint).  In response, Ms. Sager "'elected to sign'" the Vacate Agreement instead of "'going through the [lease termination] process.'"  *Id.* ¶ 10 (quoting Termination Letter) (alteration to restore accurate quotation of Termination Letter).[7]

On or about November 29, 2010, Ms. Sager's brother notified the Commission in writing that a complaint had been filed with HUD regarding the process by which Ms. Sager had been induced to sign the Vacate Agreement.  *Id.* ¶ 12.  The same day, Ms. Flynn sent the Termination Letter to plaintiff, stating that her Lease was terminated, effective December 8, 2010, because of "'violations of material terms of [her] lease.'"  *Id.* ¶ 13 (quoting Termination Letter at 1).

The Termination Letter articulated the alleged breaches in detail.  In brief, most of the alleged violations cited by Ms. Flynn consisted of several occasions in October and November 2010, in which plaintiff either left the water in her kitchen sink running, causing flooding and water damage in her apartment and other nearby apartments, or left her stove on, creating smoke and causing a fire hazard and, in one instance, a fire.  During many of these incidents, plaintiff

---

[7] Assuming the authenticity of the copy of the Termination Letter submitted by defendants, which plaintiff has not disputed, plaintiff misquotes it in two respects in her Complaint.  First, the Complaint quotes Ms. Flynn as stating that Ms. Sager "'elected to sign an intent to Vacate instead of going through the eviction process.'"  Complaint ¶ 10.  The relevant sentence of the Termination Letter actually recounts that Ms. Sager "elected to sign a Vacate Agreement to move by December 8, 2010 as opposed to going through the lease termination process."  Termination Letter at 5.  Second, the Complaint quotes Ms. Flynn as stating that, during the visit to Ms. Sager's apartment on November 8, 2010, Ms. Sager spoke "'somewhat incoherently about an intruder in her apartment.'"  Complaint ¶ 9.  That sentence does not appear in the Termination Letter, although the letter does contain Ms. Flynn's assertion that, during the visit, Ms. Sager "began to talk about there being people in [her] apartment that were not real."  Termination Letter at 5.

allegedly was incoherent and delusional, and her apartment also contained serious housekeeping deficiencies, including trash spread throughout the apartment and open and spoiled food on the floors and counters.  *See generally* Termination Letter at 3-6.  Plaintiff attributes these incidents, in part, to her "mental health disabilities," which she claims were exacerbated by "recent traumatic events in her life including the death of her mother in August" 2010.  Complaint ¶ 16.

As noted, the Termination Letter purported to terminate Ms. Sager's Lease "effective December 8, 2010."  Termination Letter at 1.  It also advised plaintiff: "[Y]ou have the right to an Informal Grievance Hearing in accordance with our grievance procedure, providing you request same within ten (10) working days from the date of this letter."  *Id.* at 7.  Moreover, the letter stated: "Should the Informal Grievance Hearing not resolve the above matters to your satisfaction, you shall have the right to request a Formal Grievance Hearing within five (5) days of the date of the notice of determination of the Informal Hearing."  *Id.*

Along with the Termination Letter, the Commission sent Ms. Sager an invoice for three maintenance charges, totaling $380, for "kitchen sink," "excessive cleaning," and "flooding." Ex. 2 to Complaint ("November 2010 Invoice") (ECF 2-2) (capitalization altered).   The November 2010 Invoice informed Ms. Sager that the charges were "due and payable with [her] rent," and advised that she had the right, within ten working days, to request an "informal hearing" regarding the matter, pursuant to the Commission's grievance procedure.  *Id.*  The November 2010 Invoice also stated: "If you do not request a hearing as stated above, you will be deemed to have waived your right to dispute the charges."  *Id.*

On or about December 6, 2010, Ms. Sager sent the Commission a written request for an "informal grievance hearing" as to the termination of her Lease.  Complaint ¶ 15.  It was held on December 9, 2010, before Diane Haislip, a "hearing officer."  Ms. Sager was not represented by

counsel, but "presented evidence regarding her mental health disabilities, the recent traumatic events in her life including the death of her mother in August, and the supports [sic] and treatment that she was receiving at the time."   Complaint ¶ 16.   Ms. Sager also informally requested transfer to another apartment.  *Id.*  In a letter issued on or about December 21, 2010, Ms. Haislip upheld Ms. Flynn's determination to terminate plaintiff's Lease.  *Id.* ¶ 17.[8]

On or about December 26, 2010, Ms. Sager requested a formal grievance hearing.  *Id.* ¶ 18.  At the hearing, conducted on February 14, 2011, by hearing officer John Harris, Ms. Sager was represented by counsel.  *Id.* ¶ 19.[9]  According to plaintiff, the Commission's evidence included testimony by Ms. Haislip, the informal hearing officer, and an "Incident Inquiry Report" dated November 18, 2010.  *Id.* ¶ 20.[10]  No evidence regarding the basis for the determination of the maintenance charges for "excessive cleaning" or "flooding" was presented. *Id.* ¶ 21.

---

[8] Ms. Haislip's letter of December 21, 2010, was submitted as part of an exhibit to Mr. Martin's affidavit, which in turn was submitted as an exhibit to defendants' Motion.  *See* Ex.B. to Martin Aff. (ECF 8-4 at 55-56).  In the letter, Ms. Haislip is identified not only as the "hearing officer" for the informal hearing, but also as the Commission's "Chief Operations Officer."  *Id.*

[9] Exhibit B to Mr. Martin's affidavit contains a document dated February 14, 2011, titled "HCAAC Formal Grievance Hearing [–] Summary of Hearing [–] Lease Terminations" (the "Hearing Summary").  *See* ECF 8-4 at 58-59.  The Hearing Summary, which is a printed form that has been partially completed by hand, indicates that the formal grievance hearing was conducted by a hearing panel, presided over by Mr. Harris as hearing officer, and consisting of three other panel members, each of whom signed the Hearing Summary (their signatures are not entirely legible).  Although Mr. Martin avers in his affidavit that the Hearing Summary is a "true and accurate copy" of records kept by the Commission, *see* Martin Aff. ¶ 7, he does not indicate whether it was ever transmitted to Ms. Sager, nor does the Hearing Summary itself indicate that it was transmitted to her.  Plaintiff does not discuss the Hearing Summary in her Complaint.  The content of the Hearing Summary will be addressed in further detail in the Discussion.

[10] The "Incident Inquiry Report" is not contained in the record.  However, plaintiff alleges that the report "had been faxed to 'JohnH' at the HCAAC on November 18, 2010," and contends that the "similarity between the named recipient of the facsimiles [sic] and the name of the 'impartial hearing officer,' John Harris, is noteworthy and raises concerns regarding impartiality."  Complaint ¶ 20.

On February 16, 2011, Ms. Flynn sent plaintiff a letter via certified mail, on behalf of the Commission, regarding the "results for [the] formal grievance hearing," which stated, in its entirety: "This is to officially inform you that the decision of the Housing Commission of Anne Arundel County was upheld as a result of the hearing on Monday, February 14, 2011 at 1:00 p.m." Ex.3 to Complaint (ECF 2-3) (capitalization and emphasis omitted); *see* Complaint ¶ 23. The same day, the Commission filed a Complaint for Breach of Lease against Ms. Sager in the District Court of Maryland for Anne Arundel County (District 7), docketed as Case No. 0702-SP-00442-2011 (the "Breach of Lease Case").  Complaint ¶ 22; See Md. Code (2006 Repl. Vol., 2011 Supp.), § 1-602(7) of the Courts and Judicial Proceedings Article ("C.J."). [11]

On or about March 3, 2011, Ms. Sager filed a written request for transfer to a different apartment building operated by the Commission.  Complaint ¶ 24; *see also* Ex.4 to Complaint ("March 2011 Transfer Request") (ECF 2-4).  The Commission denied the request on March 22, 2011.  Complaint ¶ 29; *see also* Ex.8 to Complaint (ECF 2-8).  On March 29, 2011, plaintiff's counsel wrote to the Commission's counsel, asserting that Ms. Sager was now receiving additional professional services for her disabilities and was "stable."  Her attorney also requested that the Commission offer plaintiff a "reasonable accommodation" for her disabilities, in the form of "accepting Ms. Sager's good faith efforts and subsequent success in proactively addressing her medical needs," and urged voluntary dismissal of the Breach of Lease Case.  Ex.9 to Complaint (ECF 2-9); *see* Complaint ¶ 30.  The Commission would not agree to this request,

---

[11] The District Court of Maryland is a state trial court of limited jurisdiction.  *See* C.J. §§ 1-601 *et seq.* & §§ 4-101 *et seq.*  Among other types of proceedings over which it has jurisdiction, the District Court of Maryland has exclusive original jurisdiction over actions "involving landlord and tenant," C.J. § 4-401(4), including breach of lease actions, which are governed by R.P. § 8-402.1.

and the Breach of Lease Case proceeded.[12]  On April 5, 2011, the District Court scheduled trial in the Breach of Lease Case for September 1, 2011.  *See* Ex.15 to Complaint (ECF 2-15).[13]

### 3.  "Other Charges" and the Rent Cases

In the meantime, on or about March 2, 2011, Ms. Sager tendered to the Commission a money order in the amount of $192, a sum equal to her monthly rent for March.  Complaint ¶ 25.  According to the Commission's ledger, however, the Commission applied the payment to the $380 in outstanding maintenance charges.  *Id.* (citing Ex.5 to Complaint (ECF 2-5)).

On March 15, 2011, the Commission sent Ms. Sager a letter stating that $481.36 was due and owing on her account, which consisted of $192 in rent; $9.60 in "Late & Other"; $78 for "Legal," and $201.76 for "Maintenance."[14]  Ex.6 to Complaint (ECF 2-6).  The letter also stated that "Housing Commission policy is to file for non-payment of rent on the 15th of the month," but also stated that the "'PHA shall give written notice of the proposed termination of the Lease in . . . 14 days in the case of failure to pay rent.'"  *Id.* (quoting Lease).  The letter contained the handwritten notation, "Please pay by 3/21/11."  *Id.*

---

[12] Although the Complaint does not discuss subsequent negotiations between plaintiff and the Commission regarding the potential of a "reasonable accommodation" or settlement of the Breach of Lease Case, the Commission has submitted, as exhibits to the affidavit of Mr. Martin, two letters from its counsel to Ms. Sager's counsel regarding these issues.  *See* Ex.F & Ex. G to Martin Aff. (ECF 8-4 at 74-79, ECF 8-5 at 1-4).  I will review the content of those letters, to the extent necessary, in the Discussion.

[13] The Breach of Lease Case was pending at the time that plaintiff filed her Complaint in this case, and remained pending when the Motion was filed.  However, as I shall explain, the Breach of Lease Case apparently has since concluded.

[14] If the amount of outstanding maintenance charges had only been $380 and Ms. Sager's $192 payment was applied to those charges, the remainder would have been only $188, not the $201.76 indicated in the Commission's letter of March 15, 2011.  However, according to HCAAC's ledger for Ms. Sager's account, another maintenance charge of $13.76 for "Garbage Disposal" was applied to her account on December 6, 2010. ECF 2-5 at 1 (capitalization altered).  The Commission's notice of this charge to Ms. Sager, if any, is not contained in the record.

The same day, March 15, 2011, HCAAC initiated a summary ejectment action against Ms. Sager for failure to pay rent, which was docketed in the District Court of Maryland for Anne Arundel County as Case No. S. Ej. 1172-0000-7364 (the "First Rent Case").[15]  Complaint ¶ 27. The Commission alleged that Ms. Sager owed $192 in rent plus $9.60 in late fees.  *Id.*

On March 21, 2011, the Commission sent another letter to plaintiff, generally containing the same contents as the letter of March 15, 2011, but this time asserting that a total of $498.36 was due and owing.  Ex.7 to Complaint (ECF 2-7); *see also* Complaint ¶ 28.  The basis for the $17 increase, over and above the amount stated in the previous letter, was that the Commission now alleged that $95 in "Legal" fees was due and owing.  Ex.7 to Complaint.  Handwritten on the letter was the notation, "Court 3/22/11 Please pay by 7:00 AM." *Id.*[16]

---

[15]  Summary ejectment actions for failure to pay rent are governed in Maryland by R.P. § 8-401.  Actions under that statute are "'expedited'" proceedings, designed to "'provide[] a means by which a landlord [may] rapidly and inexpensively obtain repossession of his premises'" after a tenant fails to pay rent.  *McDaniel v. Baranowski*, 419 Md. 560, 586, 19 A.3d 927, 943 (2011) (citations omitted).  Pretrial discovery is not permitted in a summary ejectment action, *see* Md. Rule 3-711, and, in most cases, R.P. § 8-401 requires that trial be held "on the fifth day after the filing of the complaint."  R.P. § 8-401(b)(6)(i)(1).  "If, when the trial occurs, it appears to the satisfaction of the court that the rent, or any part of the rent and late fees are actually due and unpaid, the court shall determine the amount of rent and late fees due as of the date the complaint was filed," R.P. § 8-401(c)(2)(ii), and "order that possession of the premises be given to the landlord, or the landlord's agent or attorney, within 4 days after the trial."  R.P. § 8-401(c)(3).  In addition to obtaining repossession of the premises, a residential landlord can obtain a money judgment for "the amount of rent and late fees determined to be due together with costs of the suit," but only if the tenant was "personally served with a summons."  R.P. § 8-401(c)(2)(iv); *see also* R.P. § 8-401(b)(6)(ii)(2); *Brown v. Hous. Opportunities Comm'n of Montgomery County*, 350 Md. 570, 577 n.1, 714 A.2d 197, 200 n.1 (1998).  The procedure under R.P. § 8-401 is discussed in more detail, *infra*.

[16]  In Ms. Sager's HCAAC account ledger, which was submitted as Exhibit 5 to her Complaint, a $78 charge was applied on February 17, 2011, under the category "Legal," with the notation "Breach of Lease."  ECF 2-5 at 1 (capitalization altered).  On March 16, 2011, an additional "Legal" charge of $17 was applied, with the notation "Landlord Complaint."  *Id.* (capitalization altered).  Notably, $17 is the sum of the filing fee and sheriff's service fee payable in a summary ejectment proceeding for nonpayment of rent under R.P. § 8-401, while $78 is the sum of the filing fee and sheriff's service fee payable in a breach of lease proceeding under R.P. § 8-402.1.  *See* District Court of Md. Admin. Reg. XIX (Cost Schedule), *available at*

Trial was held in the First Rent Case on March 22, 2011.  Complaint ¶ 27.  Ms. Sager appeared without counsel and produced a receipt for her March rent payment.  The court then dismissed the case.  *Id.*

In early April 2011, Ms. Sager tendered to the Commission a money order in the amount of $192, a sum equal to her monthly rent for April.[17]  The Commission again credited the payment to the maintenance charges, rather than plaintiff's rent.  Complaint ¶ 32; *see also* Ex.5 to Complaint.  On April 12, 2011, the Commission sent a third letter to Ms. Sager regarding her account balance.  *See* Ex.10 to Complaint (ECF 2-10).  The letter had the same content as the previous two letters, except that it stated that a total of $700.36 was due and owing, consisting of $384 in rent; $19.60 in "Late & Other" fees; $95 in "Legal" fees; and $201.75 for "Maintenance."  *Id.*  The letter also contained a handwritten notation: "Please pay this amount as we filed in court on 4-15-11.  Pay by 5:00 PM on 4-14-11."  *Id.*  Notably, the letter of April 12, 2011, did not reflect plaintiff's payment of $192.  Apparently, that payment was not credited to plaintiff's account until April 14, 2011.  *See* note 17, *supra.*

On April 15, 2011, the Commission filed a second ejectment action against Ms. Sager, docketed in the District Court of Maryland for Anne Arundel County as Case No. 1172-0000-9803 (the "Second Rent Case").  Complaint ¶ 34.  In its complaint, HCAAC alleged that $384 in rent was due and owing (*i.e.*, two months' worth of rent, at the monthly rate of $192), plus $10 in late fees.  *Id.*

---

http://www.courts.state.md.us/district/forms/acct/dca109.pdf.

[17] In two successive paragraphs, plaintiff's Complaint alleges, first, that she tendered payment of $192 for her April rent on or about April 4, 2011, *see* Complaint ¶ 31, and second, that she tendered "a money order in the amount of $192.00 to the Housing Commission" on April 7, 2011.  Complaint ¶ 32.  These appear to be duplicative references to the same payment of $192, rather than an assertion that plaintiff made two payments in early April 2011 of $192 each.  The Commission's ledger for Ms. Sager's account reflects only one $192 payment in April 2011, which was applied to her account on April 14, 2011.  ECF 2-5 at 5.

On April 18, 2011, the Commission sent Ms. Sager a fourth letter regarding her account balance, reflecting that her payment of $192 had been applied to the maintenance charges.  Ex.11 to Complaint (ECF 2-11).  According to the fourth letter, Ms. Sager owed a total of $508.36, comprised of $384 in rent; $19.60 in "Late & Other" fees; $95 in "Legal" fees; and $9.76 for "Maintenance."  *Id.*  Otherwise, the content of the fourth letter was the same as the prior letters, except that there was no handwritten notation.  *See id.*

Trial was held in the Second Rent Case on April 22, 2011.  Complaint ¶ 36.  Again, Ms. Sager appeared without counsel and presented a receipt for her April payment.  *Id.*  This time, however, the District Court granted judgment for possession of the premises in favor of the Commission.  *Id.*  According to plaintiff, the court accepted the Commission's argument that a provision of the Lease, quoted *supra*, permitted the Commission to apply rental payments to other outstanding charges unless the words "rent" or "for rent" were written on the instrument of payment.[18]  *Id.*

On April 27, 2011, Ms. Sager noted an appeal in the Second Rent Case to the Circuit Court for Anne Arundel County.  Complaint ¶ 37.[19]  Simultaneously with filing her notice of appeal, Ms. Sager filed in the state District Court a "Motion to Stay Warrant of Restitution and to Accept Security Instead of Surety" ("Motion to Stay").  *See* Motion to Stay, Ex.12 to Complaint

---

[18] The record does not contain Ms. Sager's payment receipts or payment instruments.

[19] A decision of the District Court in an action under R.P. § 8-401 may be appealed "to the circuit court for any county at any time within 4 days from the rendition of the judgment."  R.P. § 8-401(f)(1).  In an appeal from a judgment of possession under R.P. § 8-401, "in order to stay any execution of the judgment," the tenant ordinarily must give a surety bond sufficient to "answer to the landlord in all costs and damages mentioned in the judgment, and other damages as shall be incurred and sustained by reason of the appeal."  R.P. § 8-401(f)(2).  However, Maryland Rule 1-402(e) permits a court to "accept other security for the performance of a bond," instead of a surety.  *See also* Md. Rules 7-111, 8-422, 8-423, 8-424 (governing *supersedeas* bonds and alternative security on appeal).  *See generally Baltrosky v. Kugler*, 395 Md. 468, 476-77, 910 A.2d 1089, 1094-95 (2006) (discussing bonds and alternative security on appeal).

(ECF 2-12); *see also* Complaint ¶ 38.[20]  In her Motion to Stay, Ms. Sager requested that, in lieu of a bond, the court accept as security a promissory note and a money order payable to the Commission, totaling $387, to be held in escrow pending resolution of the appeal.  *See* Motion to Stay at 1.

The following day, April 28, 2011, the District Court denied Ms. Sager's Motion to Stay by marginal order, stating: "Denied – not filed – once rent is paid – court will vacate judgment."[21]  *Id.*  As a result, Ms. Sager paid $384 to the Commission on April 29, 2011, along with a handwritten note stating that her payment was "not an admission of liability."  Ex.13 to Complaint (ECF 2-13); *see also* Complaint ¶ 39.[22]

Nevertheless, on the same day, the Commission filed a petition for a warrant of restitution in the District Court, contending that $401 was due, consisting of $384 in rent and $17 in costs.  Complaint ¶ 40.  The Commission never sought to execute the warrant, however, due to

---

[20] In an action under R.P. § 8-401, "[r]epossession, once judgment is obtained, is *swift*." *McDaniel*, *supra*, 419 Md. at 577, 19 A.3d at 937 (emphasis in original).  If the District Court grants judgment of possession in favor of the landlord, and the tenant fails to surrender possession of the premises within four days, the court is required, upon the landlord's request, to issue a warrant of restitution, "directed to any official of the county entitled to serve process" (typically, the county sheriff), ordering the official to cause the tenant to be evicted and the landlord to "have again and repossess the property."  R.P. § 8-401(d)(1)(i).  Unless extended by the court, such a warrant must be executed within sixty days after its issuance.  R.P. § 8-401(d)(1)(iii).  Ordinarily, the tenant is entitled to "redemption of the leased premises" and to avoid eviction by paying to the landlord "all past due amounts" of rent and late fees determined to be due and owing by the District Court in the judgment of possession, plus court-awarded costs and fees, "at any time before actual execution" of the warrant of restitution.  R.P. § 8-401(e)(1); *but see* R.P. § 8-401(e)(2) (foreclosing right of redemption for "any tenant against whom 3 judgments of possession have been entered for rent due and unpaid in the 12 months prior to the initiation of the action").

[21] It is unclear what the District Court meant by "not filed."

[22] In a subsequent motion filed in the Breach of Lease Case, which plaintiff submitted as Exhibit 15 to her Complaint in this case (ECF 2-15), Ms. Sager stated that the Clerk's Office in the District Court "declined to forward" her appeal in the Second Rent Case to the circuit court, and that she had "filed a line" in the District Court "requesting that the Judgment be vacated as the [District] Court indicated would happen."  ECF 2-15 at 2.  The record does not reflect whether the District Court granted this request.

Ms. Sager's $384 payment and because, on May 4, 2011, one of the Commission's property managers, Lisa Hahn, credited another $104.60 to Ms. Sager's account, consisting of $9.60 for the March late fee; $17 for "FTP court notice"; and $78 for "Breach of Lease charge." Ex.14 to Complaint (ECF 2-14); *see also* Complaint ¶ 41. In the document granting the credit, Ms. Hahn noted that the "$78.00 charge may be reapplied once case is settled or judgment determined." Ex.14 to Complaint.[23]

### C.  Initiation of This Lawsuit and Conclusion of the Breach of Lease Case

As noted, trial of the Breach of Lease Case was set for September 1, 2011. On August 18, 2011, Ms. Sager, represented by counsel, initiated this lawsuit by filing her Complaint in the Circuit Court for Anne Arundel County, Maryland, docketed as Case No. 02-C-11-163554. On the same date, Ms. Sager filed in the Breach of Lease Case a "Motion to Consolidate Cases," which she also attached as Exhibit 15 to her Complaint in the circuit court. *See* Ex.15 to Complaint (ECF 2-15). In that motion, plaintiff requested that the Breach of Lease Case, then awaiting trial in the state District Court, be consolidated with this case, then pending in state circuit court. In support of her request, plaintiff contended that the Breach of Lease Case would "require the same proof and witnesses" as this case, and that it was "in the interest of justice and judicial economy that the cases be consolidated" in the circuit court proceeding. *Id.* ¶¶ 16-17. Defendants report that the District Court denied the consolidation motion. *See* Motion at 2.[24]

---

[23] Plaintiff's Complaint does not explain the circumstances that led to the application of this "credit" to Ms. Sager's account. Presumably, the credit was applied because Ms. Sager had prevailed in the First Rent Case (to which the $9.60 late fee and the $17 legal fee were connected), and the District Court had not yet resolved the Breach of Lease Case (to which the $78 legal fee was connected).

[24] It is not entirely clear how consolidation of the two cases could have been accomplished. Maryland Rule 3-503(a)(2), in conjunction with C.J. § 6-104(b), permits an action instituted in the District Court to be transferred to a circuit court for consolidation with a circuit court action "involving at least one of the same parties, with the same subject matter,

Trial commenced in the Breach of Lease Case on September 1, 2011, but was not completed on that date. *See* Motion at 2. It was scheduled to resume on November 30, 2011. *Id*. In the meantime, on September 14, 2011, defendants timely removed this case from state circuit court to this Court, on the basis of federal question jurisdiction. *See* Notice of Removal (ECF 1); *see also* 28 U.S.C. §§ 1331, 1441. Thereafter, they filed the pending Motion.

The parties have not notified this Court regarding any further proceedings in the Breach of Lease Case. The unofficial public docket for that case, available on the Maryland Judiciary's "Case Search" website (http://casesearch.courts.state.md.us/), indicates that the trial was again continued to January 30, 2012, and that, on that date, the District Court entered judgment in favor of Ms. Sager. However, the "Case Search" docket does not reflect the basis for the District Court's ruling, nor have the parties provided any information about it.

Additional facts will be presented in the Discussion.

## Discussion

### A. Standard of Review

Defendants' Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "or in the alternative" for summary judgment under Fed. R. Civ. P. 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th

---

issues, and defenses arising out of the same circumstances," but only upon motion of "the party who filed the action in the District Court." C.J. § 6-104(b)(1). Here, the Breach of Lease Case was initiated by the Commission, not Ms. Sager. There is no other express provision for consolidation of civil cases between the District Court and a circuit court, although a proceeding originally filed in the District Court may become a circuit court proceeding as a result of an appeal (either *de novo* or on the record), *see* Md. Rule 7-102, or a timely demand for trial by jury, where applicable. *See* Md. Rule 3-325; *see also* C.J. § 4-402(e).

Cir. 2007).   However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).   If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   Fed. R. Civ. P. 12(d).   When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."   *Laughlin v. Metro Wash. Airports Authority*, 149 F.3d 253, 261 (4th Cir. 1998).[25]

Nevertheless, a district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."   5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.).   This discretion "should be exercised with great caution and attention to the parties' procedural rights."   *Id.* at 149.   In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.   *Id.* at 165-67.

---

[25] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.   *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Fisher v. Md. Dept. of Pub. Safety & Corr. Servs.*, Civ. No. JFM-10-0206, 2010 WL 2732334, at *3 (D. Md. July 8, 2010).

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont*, *supra*, 637 F.3d at 448.  However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).[26]

Notably, "'Rule 56(d) affidavits cannot simply demand discovery for the sake of discovery.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp. 2d 331, 342 (D. Md. 2011) (quoting *Young v. UPS*, No. DKC-08-2586, 2011 WL 665321, at *20, 2011 U.S. Dist. LEXIS 14266, at *62 (D. Md. Feb. 14, 2011)).  "Rather, to justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit

---

[26] Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has also "not always insisted" on a Rule 56(d) affidavit.  *Harrods*, 302 F.3d at 244 (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is pre-mature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).  Thus, if a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at its peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Id.* at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted).  A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 953 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

In her Opposition, plaintiff strenuously insists that summary judgment is premature, because "multiple material facts are in dispute in all of the Plaintiff's causes of action," Opp. at 13, and the "parties have not engaged in discovery yet, so [plaintiff] cannot state all of the facts in dispute at this time."  Opp. at 14 n.6.  Nevertheless, plaintiff has not filed an affidavit under Rule 56(d).  Moreover, several of the purported disputes of material fact that plaintiff proffers are actually legal disputes.  For instance, the "parties dispute whether the lease provisions constitute a confessed judgment."  Opp at 14.  Other factual matters raised by plaintiff do not actually appear to be in dispute.  To illustrate, plaintiff argues that, "on page 14 [of their memorandum in support of the Motion], Defendants state that HCAAC denied Ms. Sager's transfer request, while on page 17 Defendants state they did offer her a transfer."  It is evident, however, that on the referenced pages the defendants were referring to two separate transfer requests.  Under Fourth Circuit precedent, more is required to oppose a properly presented request for conversion to summary judgment.

Despite the inadequacy of plaintiff's opposition to conversion, I will exercise my discretion under Rule 12(d) not to convert the motion to one for summary judgment.  As noted, however, in "deciding whether a complaint will survive a motion to dismiss, a court evaluates

the complaint in its entirety, as well as documents attached or incorporated into the complaint" or that are "'integral to and explicitly relied on in the complaint' [to which] there [is] no authenticity challenge." *E.I. du Pont*, *supra*, 637 F.3d at 448 (citation omitted).  As I shall explain in more detail, the issues presented by the Motion are for the most part purely legal questions; resolution does not depend on consideration of matters outside the pleadings.[27]  For purposes of the contentions presented as to Counts I, II, III, and V, the legal issues are adequately framed by the facts contained in the Complaint and the other documents submitted by the parties that may be considered under Rule 12(b)(6).  As to plaintiff's claim of disability discrimination under the Fair Housing Act (Count IV), defendants have submitted some matter outside of the pleadings that is relevant but, as I shall discuss, resolution of Count IV based on summary judgment is not appropriate at this juncture.  Therefore, consideration of extraneous material (to the extent submitted by defendants) is unnecessary.

Accordingly, I will review the Motion under the well established standards for consideration of motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of a Rule 12(b)(6) motion is "'to test the sufficiency of a complaint.'"  *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that the plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

---

[27] To the extent that matters outside of the pleadings are presently in this opinion, it is strictly for purposes of background.  As I will explain, consideration of such matter would not alter my conclusions.

570 (2007)).  "A court decides whether this standard is met by separating the legal conclusions

from the factual allegations, assuming the truth of only the factual allegations, and then

determining whether those allegations allow the court to reasonably infer" that the plaintiff is

entitled to relief.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

Dismissal "is inappropriate unless, accepting as true the well-pled facts in the complaint and

viewing them in the light most favorable to the plaintiff, the plaintiff is unable to 'state a claim to

relief.'"  *Brockington v. Boykins*, 637 F.3d 503, 505-06 (4th Cir. 2011) (citation omitted).

## B.  Abstention

Because the Breach of Lease Case remained pending when this case was initiated and

when the Motion was filed, I directed the parties to address whether the Court should abstain

from resolving the merits of their dispute.  *See* ECF 11.  In particular, I asked the parties to

consider the applicability of two abstention doctrines: the doctrine of *Younger* abstention, which

counsels against federal judicial interference in certain ongoing state judicial proceedings, and

the *Wilton-Brillhart* doctrine, which affirms that the pendency of parallel state proceedings is a

factor in a federal court's inherent discretion to abstain from issuing declaratory relief.  Both

sides argue that abstention is unnecessary here.  *See* Reply at 12-14; Surreply at 1-9.  As I shall

explain, I agree.

*Younger* abstention takes its name from *Younger v. Harris*, 401 U.S. 37 (1971), in which

the Supreme Court held that, absent extraordinary circumstances, a federal court should not

enjoin a pending state criminal proceeding, due to concerns for comity and federalism.  Since

*Younger*, the Court has widened the scope of this abstention doctrine to include some cases in

which the underlying state proceeding is civil, *see, e.g.*, *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1

(1987); *Juidice v. Vail*, 430 U.S. 327 (1977), as well as cases seeking equitable relief other than

injunctions, including declaratory relief. *See, e.g.*, *Samuels v. Mackell*, 401 U.S. 66 (1971). Under *Younger* abstention, federal courts abstain from resolving suits when there is "an ongoing state judicial proceeding brought prior to substantial progress in the federal proceeding," and the state proceeding "implicates important, substantial, or vital state interests" and provides an adequate opportunity to resolve the parties' federal claims or defenses. *Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006). Whether to abstain under *Younger* is discretionary with the district court. *Martin Marietta Corp. v. Md. Comm'n on Human Relations*, 38 F.3d 1392, 1396 (4th Cir. 1994). Moreover, abstention "is not necessarily appropriate in every civil action that meets the formal requirements of the *Younger* doctrine." *Richmond, Fredericksburg & Potomac Ry. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993).

Upon careful consideration, I conclude that *Younger* abstention is unwarranted here. First, although the Breach of Lease Case was pending when this suit was initiated, it appears that the Breach of Lease Case has now been resolved. Therefore, there is no longer "an ongoing state judicial proceeding." *Nivens v. Gilchrist*, 444 F.3d at 241. Notably, "'*Younger* requires that the state proceeding must be ongoing at the time the district court enters its order regarding abstention.'" *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1250 n.3 (8th Cir. 2012) (citation omitted). Therefore, "[a]bsent any *pending* proceeding in state tribunals . . . application by the lower courts of *Younger* abstention [is] clearly erroneous." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (emphasis in original). *See also Edwards v. Illinois Bd. of Admissions to the Bar*, 261 F.3d 723, 727-28 (7th Cir. 2001) (stating, where state judicial proceedings concluded between issuance of district court's order and federal appellate court's decision reviewing order: "Abstention is only appropriate 'when there is an ongoing state proceeding,' thus 'abstention is no longer appropriate' here . . . .") (citations omitted); *Nat'l Pharmacies, Inc.*

*v. Feliciano-de-Melecio*, 221 F.3d 235, 240 (1st Cir. 2000) ("A federal court cannot be expected to defer to local proceedings that either no longer exist or in which the decisionmakers have clearly indicated their preference that the federal court act. Thus, the district court correctly declined to abstain under *Younger*."); *Reaching Hearts Int'l, Inc. v. Prince George's County*, 584 F. Supp. 2d 766, 793 & n.20 (D. Md. 2008) (holding *Younger* abstention inapplicable "because the state proceedings are no longer pending"), *aff'd*, 368 F. App'x 370 (2010).[28]

Moreover, *Younger* abstention is only appropriate where the parallel state proceeding "implicates important, substantial, or vital state interests." *Nivens*, *supra*, 444 F.3d at 241. "Courts are divided as to whether a state has a significant interest in an eviction action." *Kemp v. Chicago Hous. Auth.*, No. 10-C-3347, 2010 WL 2927417, at *5 (N.D. Ill. July 21, 2010) (collecting cases). However, the cases finding that a significant state interest is present in an eviction proceeding so as to warrant *Younger* abstention "have not involved the additional federal interest in public housing." *Id.* As the Third Circuit concluded, rejecting *Younger* abstention in a case concerning federal rights established under the Housing Act, "whatever the state's interest may be in regulating proceedings which result in removal of citizens from their homes, it cannot supersede the relevant federal interests in governing the expenditure of federal funds for [public] housing programs." *Ayers v. Philadelphia Hous. Auth.*, 908 F.2d 1184, 1195 n.21 (3d Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991); *accord Kemp*, 2010 WL 2927417, at *5 (quoting *Ayers*); *see also Harper v. Pub. Serv. Comm'n of W. Va.*, 396 F.3d 348, 356 (4th Cir. 2005) ("When there is an overwhelming federal interest . . . no state interest, for abstention

---

[28] Of course, resolution of the Breach of Lease Case may implicate the doctrines of *res judicata*, collateral estoppel, mootness, or the *Rooker-Feldman* doctrine, which "prohibits 'lower federal courts . . . from exercising appellate jurisdiction over final state-court judgments," *Adkins v. Rumsfeld*, 464 F.3d 456, 463 (4th Cir. 2006) (citation omitted), *cert. denied*, 551 U.S. 1130 (2007). However, because neither the record nor the grounds of the decision in the Breach of Lease Case are before me, I am unable to determine whether or to what extent those doctrines might apply here.

purposes, can be nearly as strong at the same time."). For the foregoing reasons, I do not find that *Younger* abstention is appropriate.[29]

Consideration of the *Wilton-Brillhart* abstention doctrine is also appropriate. In *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), the Supreme Court reaffirmed its prior holdings that "'[o]rdinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties.'" *Id.* at 282 (quoting *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942)). Fourth Circuit decisions subsequent to *Wilton* have considered the pendency of parallel state court proceedings as one of several factors that federal district courts should consider in deciding whether to exercise jurisdiction in a declaratory proceeding. *See, e.g.*, *Aetna Cas. & Ins. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419 (1998). Here, of course, plaintiff seeks not only declaratory relief, but also damages. The Fourth Circuit has held that "the *Brillhart/Wilton* standard does not apply when a declaratory judgment claim is joined with a nondeclaratory claim, such as a claim for damages or injunctive relief." *Great American Ins. Co. v. Gross*, 468 F.3d 199, 211 (4th Cir. 2006). The Court explained: "Because a court is required to address nondeclaratory claims, . . . the benefit derived from exercising discretion not to grant declaratory relief is frustrated" in such a case. *Id.* Moreover, as already discussed, the Breach of Lease Case is no longer pending. Therefore, *Wilton-Brillhart* abstention is not warranted.

A federal court considering abstention from a matter over which it has jurisdiction must always be mindful of the "basic proposition that 'abstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Emp'rs Res. Mgmt. Co. v. Shannon*, 65 F.3d 1126,

---

[29] Having concluded that *Younger* abstention is inappropriate for these reasons, I need not consider plaintiff's additional argument that the Breach of Lease Case would not have afforded plaintiff an adequate opportunity to present her federal claims.

1134 (4th Cir. 1995) (quoting *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)), *cert. denied*, 516 U.S. 1094 (1996). Indeed, the federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given'" them. *Deakins v. Monaghan*, 484 U.S. 193, 531 (1988) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

For all of the foregoing reasons, the Court will not abstain from exercising its jurisdiction, and will address the merits.

### C. Availability of Relief and Exhaustion of Administrative Remedies

Preliminarily, defendants claim that plaintiff "is not legally entitled to any of the relief she seeks." Motion at 22. They claim that Count III of plaintiff's Complaint, which alleges violations of the Housing Act, 42 U.S.C. §§ 1437 *et seq.*, and its implementing regulations, is deficient because the Housing Act does not contain a private right of action. Motion at 16. In addition, they assert that none of the statutes on which plaintiff's suit is based permits an award of treble damages, or damages for pain and suffering. Motion at 12-13. Finally, defendants assert that at least some of plaintiff's claims are barred due to her alleged failure to exhaust administrative remedies. Motion at 10-11. I will consider these arguments in turn.

Defendants' challenge to Count III is unavailing. It is true that the Housing Act does not, itself, contain an express private right of action, and courts have held that it does not support direct implication of a cause of action. *See Perry v. Hous. Auth. of City of Charleston*, 664 F.2d 1210, 1211-17 (4th Cir. 1981). However, the Supreme Court has held that particular provisions of the Housing Act, which provide residents of public housing with "specific or definable rights" that are not "beyond the competence of the judiciary to enforce," are "enforceable rights under . . . [42 U.S.C.] § 1983." [30] *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S.

---

[30] In *Maine v. Thiboutot*, 448 U.S. 1 (1980), the Supreme Court held that 42 U.S.C. § 1983 authorizes a cause of action to enforce violations of federal statutory rights by agents of

418, 430, 432 (1987) (holding that residents of public housing have cause of action under § 1983 for PHA's denial of statutorily-mandated "reasonable" utility allowances); *see Farley v. Philadelphia Hous. Auth.*, 102 F.3d 697, 702-04 (3d Cir. 1996) (holding that, under § 1983, residents of public housing may enforce award issued pursuant to the statutorily-mandated grievance procedure); *Mananioba v. Fairmont Hous. Auth.*, 922 F.2d 836 (4th Cir. Jan. 14, 1991) (unreported) (per curiam) (holding that resident of public housing has right to grievance hearing prior to eviction, enforceable under § 1983); *Samuels v. District of Columbia*, 770 F.2d 184, 197 (D.C. Cir. 1985) (same); *Conway v. Hous. Auth. of City of Asheville*, 239 F. Supp. 2d 593, 598-600 (W.D.N.C. 2002) (same); *Richmond Tenants Org. v. Richmond Redevelopment & Hous. Auth.*, 751 F. Supp. 1204, 1212-13 (E.D. Va. 1990) (holding that public housing residents' right against "unreasonable terms and conditions" in leases is enforceable under § 1983), *aff'd*, 947 F.2d 942 (4th Cir. 1991) (unreported) (per curiam).

Plaintiff expressly invokes § 1983 as the mechanism for her cause of action as to "rights conferred by federal law." *See* Complaint ¶ 5. To the extent that she asserts violations of specific and definable rights conferred on residents of public housing by the Housing Act, her claims do not fail for want of a private right of action.

However, defendants are correct in asserting that treble damages are not available to plaintiff; there is no statutory entitlement to treble damages, *per se*, in a suit under § 1983.[31] In a

---

the State. Section 1983 provides, in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[31] Punitive damages are recoverable "in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

suit by a private litigant, the Maryland CPA authorizes the plaintiff to "recover for injury or loss sustained by him as the result" of an unfair or deceptive trade practice, C.L. § 13-408(a), as well as an award of "reasonable attorney's fees."  C.L. § 13-408(b).  However, there is no statutory provision in the CPA for treble damages, and "[p]unitive damages may not be awarded in an action brought under § 13-408."  *Hoffman v. Stamper*, 385 Md. 1, 49, 867 A.2d 276, 304 (2005).  Similarly, R.P. § 8-208, which prohibits certain provisions in residential leases and forms the basis of Count II of plaintiff's Complaint, entitles a tenant to recover only "actual damages incurred . . . including reasonable attorney's fees" as the result of a landlord's inclusion of a prohibited provision in a lease.  R.P. § 8-208(g).  It does not authorize recovery of treble damages.  Accordingly, I will dismiss plaintiff's request for treble damages.

In contrast, both § 1983 and the CPA permit recovery of damages for emotional distress or pain and suffering, under certain circumstances.  The Supreme Court has held that "mental and emotional distress" caused by the denial of federal civil rights "is compensable under § 1983," provided that there is "proof that such injury actually was caused," which is "evidenced by one's conduct and observed by others."  *Carey v. Piphus*, 435 U.S. 247, 264 & n.20 (1978); *see also Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307-08 (1986).  In *Price v. City of Charlotte*, 93 F.3d 1241, 1254 (4th Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997), the Fourth Circuit held that a § 1983 plaintiff who seeks damages for emotional distress "must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages."  The *Price* Court also articulated several factors to "aid triers of fact in determining the propriety

---

indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Moreover, a "prevailing party, other than the United States," may recover an award of reasonable attorneys' fees in a § 1983 action.  42 U.S.C. § 1988(b).

of awarding compensatory damages for emotional distress." *Id.*

Similarly, the Maryland Court of Appeals has held that "noneconomic damages," which include damages for pain and suffering, are available under the CPA, up to the limits established by C.J. § 11-108, Maryland's statutory cap on noneconomic damages for personal injury. *See N.B.S., Inc. v. Green*, 409 Md. 528, 541, 976 A.2d 279, 286 (2009); *accord Brooks ex rel. Wright v. Hous. Auth. of Baltimore City*, 411 Md. 603, 627, 984 A.2d 836, 850 (2009). As the Maryland court explained in the CPA case of *Hoffman v. Stamper*, *supra*, 385 Md. at 32-38, 867 A.2d at 295-98, Maryland adheres to the so-called "modern rule" articulated in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), which permits "recovery of damages for emotional distress if there was at least a 'consequential' physical injury," in the sense that "'the injury for which recovery is sought is capable of objective determination.'" *Hoffman*, 385 Md. at 34, 867 A.2d at 296 (quoting *Vance*). This "physical" injury standard permits recovery for "such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs," *id.* at 34-35, 867 A.2d at 296, but excludes recovery "based on the plaintiff simply saying, 'This made me feel bad; this upset me.'" *Id.* at 34, 867 A.2d at 296. *See also Hauk v. LVNV Funding, LLC*, 749 F. Supp. 2d 358, 369 (D. Md. 2010) (stating that "emotional damages are cognizable damages" under the Maryland CPA). Therefore, plaintiff's request for damages for "emotional distress and mental anguish" is permissible under both § 1983 and the CPA, and is not subject to dismissal as a matter of law.[32]

As noted, defendants argue that plaintiff's failure to file grievances as to various contentions she raises, by way of the Commission's grievance procedure, "amounts to a waiver"

---

[32] Of course, I express no opinion as to whether plaintiff will ultimately be entitled to recover damages for emotional distress under the applicable standards of proof.

of her claims.   Motion at 10.   Defendants also observe that plaintiff did not challenge the Commission's actions in Maryland state court within thirty days of each action, via the "administrative mandamus" procedure provided under Maryland Rules 7-401 *et seq.*   Contending that plaintiff's "failure to exhaust her available administrative remedies bars her right" to proceed, defendants invoke the "'long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted.'"   Motion at 11 (quoting *Thetford Props. IV Ltd. P'ship v. HUD*, 907 F.2d 445, 448 (4th Cir. 1990)).   However, although defendants cite cases, including *Thetford*, that endorse the general principle of administrative exhaustion, they have produced no authority for the proposition that administrative exhaustion applies to the public housing grievance procedure.

In response, plaintiff notes that, in fact, she initiated a grievance proceeding with the Commission, and asserts that it is unclear which of her claims defendants contend have not been exhausted administratively.   In any event, she counters that failure to request a grievance hearing under public housing regulations does not waive a resident's right to challenge judicially an adverse action by a PHA.   *See* Opp. at 6-9.   Moreover, plaintiff argues that Maryland's administrative mandamus procedure does not apply to housing authorities because a PHA is not an "administrative agency" within the meaning of Maryland Rule 7-401(b).   *See* Opp. at 5-6.[33]

I need not resolve the parties' dispute regarding whether Maryland housing authorities are subject to administrative mandamus because, in my view, the doctrine of exhaustion of administrative remedies does not apply to the public housing grievance procedure.

---

[33] Maryland Rule 7-401(b) defines an "administrative agency" as "any agency, board, department, district, commission, authority, Commissioner, official, or other unit of the State or of a political subdivision of the State."

PHAs are required by federal law to "establish and implement an administrative grievance procedure" for residents of public housing to challenge "any proposed adverse public housing agency action."  42 U.S.C. § 1437d(k).  The grievance procedure must conform to federal regulations codified in 24 C.F.R. part 966, subpart B.  In particular, if a resident's grievance cannot be resolved through an informal meeting, *see* 24 C.F.R. § 966.54,[34] a resident is entitled to the opportunity for a hearing conducted by an impartial person or panel, *see id.* § 966.55(b), which must afford, *inter alia*, the rights to "examine before the grievance hearing any PHA documents, including records and regulations, that are directly relevant to the hearing," *id.* § 966.56(b)(1); to be represented by counsel or another representative of the tenant's choice, *id.* § 966.56(b)(2); to present evidence and argument and to controvert and cross-examine evidence and witnesses presented by the PHA, *id.* § 966.56(b)(4); and to obtain a "decision based solely and exclusively upon the facts presented at the hearing." *Id.* § 966.56(b)(5).

The hearing procedure gives tenants an opportunity to challenge adverse actions by the PHA and to bind the PHA to the result.  But, the procedure cannot be used by the PHA to bind a tenant.  In this respect, the grievance procedure is a one-way street.  Notably, the regulations expressly state that "failure to request a hearing shall not constitute a waiver by the complainant of his right thereafter to contest the PHA's action in disposing of the complaint in an appropriate judicial proceeding."  24 C.F.R. § 966.55(c).  Moreover, a "decision by the hearing officer, hearing panel, or [PHA's] Board of Commissioners in favor of the PHA or which denies the relief requested by the complainant in whole or in part shall not constitute a waiver of, nor affect in any manner whatever, any rights the complainant may have to a trial *de novo* or judicial

---

[34]  The Commission apparently implements 24 C.F.R. § 966.54 through so-called "informal grievance hearings."

review in any judicial proceedings, which may thereafter be brought in the matter." *Id.* § 966.57(c).

In contrast, a "decision of the hearing officer or hearing panel shall be binding on the PHA which shall take all actions or refrain from any actions, necessary to carry out the decision." *Id.* § 966.57(b). There are, however, two narrow exceptions. The PHA's Board of Commissioners may overturn a grievance decision if (1) the grievance does not concern a matter that is subject to the grievance procedure, *i.e.*, it does not involve "PHA action or failure to act in accordance with or involving the complainant's lease [or] PHA regulations, which adversely affect the complainant's rights, duties, welfare or status," *id.* § 966.57(b)(1); *see also id.* § 966.53(a) (definition of "grievance"); or (2) the "decision of the hearing officer or hearing panel is contrary to applicable Federal, State or local law, HUD regulations or requirements of the annual contributions contract between HUD and the PHA." *Id.* § 966.57(b)(2).

Given that the regulations expressly provide that neither failure to initiate the grievance procedure nor an adverse decision in the grievance procedure waives or limits a tenant's right to obtain judicial relief, it is not surprising that the Court has not discovered any case applying the requirement of administrative exhaustion to the public housing grievance procedure. Rather, the cases that address the issue have held that administrative exhaustion principles do not apply. *See, e.g.*, *Spieth v. Bucks County Hous. Auth.*, 594 F. Supp. 2d 584, 586 n.1 (E.D. Pa. 2009); *Jackson v. Philadelphia Hous. Auth.*, 858 F. Supp. 464, 470-71 (E.D. Pa. 1994); *Timmons v. Cisneros*, Civ. No. 93-1854, 1993 WL 276863, at *1 (E.D. Pa. 1993). *But see Bennington Hous. Auth. v. Bush*, 933 A.2d 207, 221 (Vt. 2007) (Burgess, J., dissenting) (arguing that administrative exhaustion principles ought to apply to the public housing grievance procedure); *Jackson*, 858 F. Supp. at 471 (while holding that administrative exhaustion is not required, opining that the

"reasons advanced for the exhaustion of administrative remedies would be served if exhaustion were required," and concluding that "a court may still consider a plaintiff's willful failure to take advantage of an obvious and easy opportunity to obtain relief without litigation, in determining the 'reasonableness' of [an] attorney fee request").

As the foregoing cases have explained, the conclusion that exhaustion of the public housing grievance procedure is not required is consonant with the "general rule" that "plaintiffs proceeding under § 1983 need not exhaust state administrative remedies before filing suit." *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 676 (4th Cir. 2005) (citing *Porter v. Nussle*, 534 U.S. 516, 523 (2002), and *Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982)).[35] Indeed, in *Wright*, *supra*, 479 U.S. 418, the Supreme Court invoked this general rule in concluding that rights conferred by the Housing Act may be enforced in § 1983 proceedings. The Court rejected the contention that the existence of the mandatory grievance procedure foreclosed a judicial remedy, stating: "[E]ven if tenants may grieve about a PHA's utility allowance schedule, . . . the existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." *Id.* at 427-28.

In accordance with the plain text of the applicable federal regulations and the case law I have reviewed, I conclude that the doctrine of exhaustion of administrative remedies does not apply to the public housing grievance procedure required by 42 U.S.C. § 1437d(k) and 24 C.F.R. part 966, subpart B.

I turn to the parties' contentions regarding plaintiff's particular substantive claims.

---

[35] The general rule against requirement of administrative exhaustion in the § 1983 context is subject to some exceptions, most notably in the context of prisoner litigation under the Prisoner Litgation Reform Act.  *See, e.g.*, *Anderson*, 407 F.3d at 676.  But, those exceptions do not apply here.

### D.  Application of Payments to "Other Charges," Rather Than to Rent

In several of the counts of her Complaint, plaintiff challenges the legality of the Lease provision that permits the Commission to apply payments received to unpaid "other charges" (such as maintenance fees, late fees, or legal fees), rather than to rent, unless the payment is "specifically designated, in written notation, as 'rent' or 'for rent.'"  Lease § III, at 2.  As plaintiff sees it, the provision constitutes an agreement to entry of a confessed judgment, which violates the CPA (Count I), the Real Property Article (Count II), and federal regulations implementing the Housing Act (Count III).

It is clear that an authorization for entry of confessed judgment is generally prohibited by each of the legal provisions on which plaintiff relies.  The CPA expressly provides that it is an "[u]nfair or deceptive trade practice[]" to utilize "a contract related to a consumer transaction which contains a confessed judgment clause that waives the consumer's right to assert a legal defense to an action."  C.L. § 13-301(12).  Because a "consumer" includes an actual or prospective lessee of consumer realty, C.L. § 13-101(c)(1), a lease of residential real property is a "contract related to a consumer transaction" within the meaning of the CPA.  *See, e.g.*, *Benik v. Hatcher*, 358 Md. 507, 522 n.9, 750 A.2d 10, 18 n.9 (2000); *Forrest v. P & L Real Estate Inv. Co.*, 134 Md. App. 371, 386-87, 759 A.2d 1187, 1196 (2000).  Moreover, R.P. § 8-208(d)(1) states: "A landlord may not use a lease or form of lease containing any provision that . . . [h]as the tenant authorize any person to confess judgment on a claim arising out of the lease."  And, pursuant to the statutory prohibition of "unreasonable terms and conditions" in public housing leases, 42 U.S.C. § 1437d(*l*)(2), HUD has directed that leases in public housing may not contain any clause that constitutes a "[c]onfession of judgment."  24 C.F.R. § 966.6(a) (italics omitted).[36]

---

[36] Under 42 U.S.C. § 3535(d), the Secretary of HUD is authorized to "make such rules and regulations as may be necessary to carry out his functions, powers, and duties."

The problem with plaintiff's claim is that, as the Commission correctly points out, Motion at 8, the Lease provision at issue does not constitute a confession of judgment.

Under Maryland law, a confessed judgment is a "device designed to facilitate collection of a debt." *Schlossberg v. Citizens Bank*, 341 Md. 650, 655, 672 A.2d 625, 627 (1996). A confession of judgment clause, occasionally described more archaically as a "cognovit," is a provision that is sometimes included in a debt instrument, by which the debtor "agree[s] to the entry of judgment against [the debtor] without the benefit of a trial in the event of default on the debt instrument." *Id.* at 655, 672 A.2d at 627; *accord* 24 C.F.R. § 966.6(a) (defining "[c]onfession of judgment," for purposes of federal public housing prohibition, as "[p]rior consent by the tenant to any lawsuit the landlord may bring against him in connection with the lease and to a judgment in favor of the landlord") (italics omitted); *see also* BLACK'S LAW DICTIONARY 296, 339 (9th ed. 2009) (definitions of "cognovit" and "confession of judgment").

In Maryland circuit courts, confessed judgments are governed by Maryland Rule 2-611 (or, in the District Court, by Maryland Rule 3-611, which is substantively identical to its circuit court counterpart). *See Schlossberg*, 341 Md. at 655, 672 A.2d at 627; *Nils, LLC v. Antezana*, 171 Md. App. 717, 726, 912 A.2d 45, 50 (2006), *cert. denied*, 397 Md. 397, 918 A.2d 469 (2007). The rules provide that an action seeking a confessed judgment is initiated by filing a complaint, accompanied by a copy of the written debt instrument containing an authorization by the debtor to confession of judgment and an affidavit in a prescribed form, in which the plaintiff must provide, *inter alia*, a statement of the amount due and owing under the instrument and proof of how that amount was determined. *See* Md. Rules 2-611(a) & 3-611(a). Thereafter, the state court must review the complaint and affidavit for sufficiency and ascertain whether "the pleadings and papers demonstrate a factual and legal basis for entitlement to confessed

judgment"; if so, the court must direct entry of judgment.  Md. Rules 2-611(b) & 3-611(b).

"Promptly upon entry of a judgment by confession, the clerk, instead of a summons, shall issue a notice informing the defendant of entry of judgment and of the latest time for filing a motion to open, modify, or vacate the judgment."  Md. Rules 2-611(c) & 3-611(c).[37]  Thus, as then-Associate Judge Robert M. Bell observed, writing for the Court of Special Appeals in *Burris v. Richards*, 79 Md. App. 554, 558 A.2d 750, *cert. denied*, 317 Md. 510, 564 A.2d 1182 (1989), unlike a conventional judicial proceeding, "[i]n the case of a confessed judgment . . . , the defendant's first notice is of the entry of judgment by confession, which means that the defendant has no opportunity, prior to entry of judgment, to raise any defenses or file any pleadings or papers."  *Id.* at 565 n.8, 558 A.2d at 756 n.8 (internal citation omitted).

---

[37] The history of confessed judgments in Maryland was traced by the Court of Special Appeals in *Alger Petroleum, Inc. v. Spedalere*, 83 Md. App. 66, 73-76, 573 A.2d 423, 427-28 (citing, *inter alia*, *Remsburg v. Baker*, 212 Md. 465, 129 A.2d 687 (1957); *Keiner v. Commerce Trust Co.*, 154 Md. 366, 141 A. 121 (1927); and *Tyrrell v. Hilton*, 92 Md. 176, 48 A. 55 (1901)), *cert. denied*, 320 Md. 800, 580 A.2d 219 (1990).  As the *Alger* Court explained, the practice of entry of judgment by confession arose from early procedures that permitted the clerk of court to enter a judgment during time periods when the court was in recess, based on the written consent of the parties or their attorneys.  *See Alger Petroleum*, 83 Md. App. at 73, 573 A.2d at 427.

Until very recently, confessed judgments were entered by the clerk of court as a ministerial act, upon the filing of the plaintiff's complaint, and were not scrutinized by the state court until and unless the defendant moved to open, modify, or vacate the judgment.  *See, e.g.*, *Garliss v. Key Fed. Sav. Bank*, 97 Md. App. 96, 103, 627 A.2d 64, 67-68 (1993) ("Confession of judgment is not a judicial act, but rather the *pro forma* entry of a judgment by the clerk of the circuit court.").  The procedure discussed above, specifying the documentation that must be submitted and requiring judicial review before entry of judgment, was adopted by the Maryland Court of Appeals in 2010, upon the recommendation of the Chief Judge of the District Court of Maryland, to address the concern that confessed judgments were too easily obtained on the basis of illegal contracts or fraudulent misrepresentations.  *See* Rules Order of Mar. 9, 2010, 37 Md. Reg. 531 (Mar. 26, 2010); *see also* Md. Standing Cmte. on Rules of Practice & Procedure, 163rd Report, at 88 (Jan. 13, 2010) (reporter's note to proposed amendments to Md. Rules 2-611 & 3-611); *SunTrust Bank v. Goldman*, 201 Md. App. 390, 399-400 & nn.3-4, 29 A.3d 724, 729 & nn.3-4 (2011) (discussing 2010 amendments to confessed judgment rules).

The current provisions applicable in Maryland state courts under the Maryland Rules are analogous to this Court's procedures with respect to confessed judgments.  *See* Local Rule 108.1.

"As a general rule, a judgment by confession is 'entitled to the same faith and credit, as any other judgment.'"  *Schlossberg*, 341 Md. at 655, 672 A.2d at 627 (quoting *Keiner v. Commerce Trust Co.*, 154 Md. 366, 370, 141 A.2d 121, 122 (1927)).  Like a money judgment entered in any other judicial proceeding, a "confessed judgment operates as a lien against the real property of the defendant located in the county where the judgment is entered."  *Schlossberg*, 341 Md. at 655, 672 A.2d at 627.  Confessed judgments may have *res judicata* effect (*i.e.*, claim preclusion), although they often will not support collateral estoppel, or issue preclusion, because typically "'[i]n the case of a judgment entered by confession . . . none of the *issues* is actually litigated.'"  *United Book Press, Inc. v. Md. Composition Co.*, 141 Md. App. 460, 477, 786 A.2d 1, 11 (2001) (quoting Restatement (Second) of Judgments § 27, Comment (e)) (emphasis in original); *see also id.* at 477-79 & nn.3-4, 786 A.2d at 11-12 & nn.3-4 (discussing collateral estoppel as applied to confessed judgments).

Maryland courts have recognized that, in some circumstances, "a confessed judgment note serves a salutary purpose."  *Nils*, 171 Md. App. at 729, 912 A.2d at 52.  "When unchallenged or not successfully challenged," a confessed judgment "permits the holder to by-pass the trouble, the time, the expense, and the uncertainty of a trial."  *Id.*  Nevertheless, "'[j]udgments by confession are not favored in Maryland, because Maryland courts have long recognized that the practice of including in a promissory note a provision authorizing confession of judgment lends itself far too readily to fraud and abuse.'"  *Gambo v. Bank of Md.*, 102 Md. App. 166, 185, 648 A.2d 1105, 1114 (1994) (citation omitted).  Therefore, the Maryland Court of Appeals "has made clear that judgments by confession are to be 'freely stricken out on motion to let in defenses.'"  *Schlossberg*, 341 Md. at 655, 672 A.2d at 627 (citation and some internal quotation marks omitted).  The disfavored status of confessed judgments is also made plain by

the many provisions of Maryland law, including the provisions relied upon by plaintiff, that prohibit the use of confessed judgment clauses in a wide variety of contractual contexts.[38]

As noted, the Lease provision of which plaintiff complains states, Lease § III, at 2:

> Any payment by the Tenant to the Landlord under this Lease which is not specifically designated, in written notation, as "rent" or "for rent", may be applied at the Landlord's option, as follows: first to outstanding maintenance charges and/or late fees and/or legal fees and secondly to rent.

Plaintiff has not cited any authority for the proposition that this Lease provision constitutes a confession of judgment, and I have found none. I conclude, as a matter of law, that this provision is not a confession of judgment.

To be sure, the provision permits the Commission, in some circumstances, to apply a tenant's payment to "other charges" under the Lease without obtaining a judicial determination that the "other charges" are due and owing. But, that does not render it a confession of judgment. Unlike a confessed judgment clause, the Lease provision does not permit the Commission to obtain a judgment in its favor for the "other charges," with all of the implications with regard to liens on property, claim or issue preclusion, and entitlement to full faith and credit that a money judgment typically entails.

---

[38] In addition to C.L. § 13-301(12) and R.P. § 8-208(d)(1), upon which plaintiff relies, the following Maryland statutes prohibit the use of confessed judgment clauses in particular types of contracts: Md. Code (2010 Repl. Vol., 2011 Supp.), § 9-302(3)(ii) of the Business Regulation Article (employment agency contracts); C.L. § 12-311(b)(1) (consumer loan instruments); C.L. § 12-507(b) (retail credit promissory notes); C.L. § 12-607(a)(2) (retail installment sales contracts); C.L. § 12-923(b)(2)(iii) (credit grantor revolving credit plans "primarily for personal, household, or family purposes"); C.L. § 12-1023(b)(2)(iii) (credit grantor closed end loans "primarily for personal, household, or family purposes"); C.L. § 12-1105(1) (rental-purchase agreements); C.L. § 14-302(4) (door-to-door sales contracts); C.L. § 14-2002(*l*)(3) (consumer motor vehicles leases); C.L. § 14-2504(4) (hearing aid sales contracts); and R.P. § 8A-202(e)(1) (mobile home park rental agreements). *See also* Md. Rules 2-611(a) & 3-611(a) (requiring affidavit submitted with complaint for confessed judgment to aver that the instrument at issue is not subject to C.L. §§ 12-311(b), 12-607, or 13-301).

Moreover, the provision does not necessarily deprive the tenant of the opportunity to challenge the Commission's imposition of "other charges." For one thing, the Lease provision only applies to payments which the tenant has not expressly designated as rent. For another, in accordance with applicable federal regulations, *see* 24 C.F.R. § 966.4(b)(4), (e)(8), the Lease obligates the Commission to give the tenant written notice of the imposition of any "other charges" at least two weeks before the charges are due, *see* Lease § III, at 2, and requires the Commission expressly to inform the tenant of her right to initiate a grievance proceeding as to the imposition of "other charges." *See* Lease § VII.H, at 5. If the tenant timely initiates a grievance proceeding, the Commission may "not take the proposed action," *i.e.*, impose the "other charges," until "the grievance process has been completed." Lease § VII.H.2, at 5.[39]

Because the Lease provision at issue is not a confession of judgment, Count II of plaintiff's Complaint, which solely alleges a violation of the prohibition of confessed judgment clauses in residential leases, R.P. § 8-208(d)(1), will be dismissed, with prejudice. In addition, Counts I and III will also be dismissed, with prejudice, to the extent that they allege violations of the CPA's ban on confessed judgment clauses in contracts related to consumer transactions, C.L. § 13-301(12) (as to Count I), and the federal regulatory ban on confessed judgment clauses in public housing leases, 24 C.F.R. § 966.6(a) (as to Count III).

To be clear, however, I express no conclusion as to whether the Lease provision permitting the Commission to allocate otherwise unallocated payments to "other charges," before allocation to overdue rent, might be legally infirm on other grounds. Although it does not appear

_____

[39] The facts alleged by plaintiff, especially with respect to the timing of the various letters notifying Ms. Sager of the imposition of "other charges," relative to the timing of the Commission's initiation of suit in the First Rent Case and the Second Rent Case, raise some doubt as to whether the Commission in fact complied fully with the Lease and the federal regulations in this respect. However, the extent to which the Commission actually complied with the Lease provisions is a separate issue from the legal question of whether the provision that plaintiff challenges is a confession of judgment.

that any regulation issued by HUD expressly prohibits the Lease provision, there is no regulation that requires or expressly permits it. The Lease provision regarding application of payments potentially could be challenged under the Housing Act's general prohibition of "unreasonable terms and conditions" in public housing leases. 42 U.S.C. § 1437d(*l*)(2).[40]

Count III of plaintiff's Complaint argues generally that various practices of the Commission violate the Housing Act, but plaintiff does not expressly invoke 42 U.S.C. § 1437d(*l*)(2). Her Complaint alleges, in conclusory fashion, that the Commission's practice and procedure of "applying payments to various charges," rather than rent, constitutes an "improper and illegal violation[] of the Federal Housing Act." Complaint ¶ 67. And, in her Surreply, plaintiff invokes the Brooke Amendment, a provision of the Housing Act originally enacted in 1969 and now codified in 42 U.S.C. § 1437a(a), which places strict upper limits on the proportion of a public housing resident's income that may be charged as "rent." Federal regulations also dictate, in detail, how the amount of "tenant rent" is to be calculated. *See* 24 C.F.R. part 5, subpart F. Several courts have held that the Brooke Amendment and the regulations governing calculation of "tenant rent" effectively prohibit PHAs from seeking to

---

[40] Several courts have concluded that the ban on "unreasonable terms and conditions" in § 1437d(*l*)(2) is enforceable by residents of public housing in a § 1983 action. *Richmond Tenants Org.*, *supra*, 751 F. Supp. 1204, 1212-13 (E.D. Va. 1990) (articulating standards for judicial determination of "reasonableness" of a public housing lease provision); *see, e.g.*, *Cabrini-Green Local Advisory Council v. Chicago Hous. Auth.*, No. 96-C-6949, 2007 WL 294253, at *2-4 (N.D. Ill. Jan. 29, 2007) (adopting *Richmond Tenants Organization* test); *Diggs v. Hous. Auth. of the City of Frederick*, 67 F. Supp. 2d 522, 531-32 (D. Md. 1999); *see also HUD v. Rucker*, 535 U.S. 125, 133 n.5 (2002) (in reviewing § 1983 challenge to regulations authorizing particular lease provision regarding eviction of tenants whose household members engage in drug-related criminal activity, holding that the lease provision "does not violate § 1437d(*l*)(2)"); *Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1122 (6th Cir. 1989) (considering § 1983 challenge to PHA lease provision under predecessor provision to § 1437d(*l*)(2) and concluding that lease provision "was entirely reasonable"); *cf. Wright*, *supra*, 479 U.S. at 430-31 (holding that Housing Act provision requiring PHAs to establish "a 'reasonable' allowance for utilities" is "sufficiently specific and definite" to qualify as an enforceable right "under . . . § 1983," and is not "beyond the competence of the judiciary to enforce"); *Dorsey v. Hous. Auth. of Baltimore City*, 984 F.2d 622, 630-31 (4th Cir. 1993) (same).

recover "other charges" under the guise of rent, by designating the charges as "additional rent" or

by initiating summary rent court proceedings, akin to the R.P. § 8-401 procedure, to collect

charges that cannot qualify as "rent" under federal law.   *See, e.g.*, *Hous. Auth. & Urban*

*Redevelopment Agency of the City of Atlantic City v. Taylor*, 796 A.2d 193, 197-202 (N.J. 2002);

*see also O'Neill v. Hernandez*, No. 08-Civ-1689, 2010 WL 1257512, at *5 (S.D.N.Y. Mar. 25,

2010); *Binghamton Hous. Auth. v. Douglas*, 630 N.Y.S.2d 144, 145 (N.Y. App. Div. 1995).

Arguably, the Lease provision regarding application of payments is an attempt to allow

the Commission to accomplish indirectly what the Brooke Amendment prevents it from doing

directly: recover "other charges" by means of a summary ejectment proceeding for nonpayment

of rent under R.P. § 8-401.[41]   Aside from R.P. § 8-401, the Commission's principal options for

judicial recovery of "other charges" are either (1) to file a conventional civil suit to obtain a

money judgment for the "other charges,"[42] or (2) to initiate a breach of lease proceeding under

---

[41] Even without the Brooke Amendment, it would be questionable whether a PHA in
Maryland could collect "other charges" as "rent" in a proceeding under R.P. § 8-401.   The
Maryland Court of Appeals has stated that, for purposes of R.P. § 8-401, "'rent', in its legal
connotations, is the compensation paid by a tenant for the use of land."   *Univ. Plaza Shopping
Ctr., Inc. v. Garcia*, 279 Md. 61, 65-66, 367 A.2d 957, 960 (1977).   The *Garcia* Court held that a
commercial landlord and tenant could contractually agree to treat as rent other "charges which
may be definitely ascertained, paid by the tenant, and going to his use, possession and enjoyment
of rental commercial premises," but expressly declined to extend this holding to the context of
residential leases.   *Id.* at 67, 367 A.2d at 961; *accord Shum v. Gaudreau*, 317 Md. 49, 62-63, 562
A.2d 707, 714 (1989) (reaffirming that *Garcia*'s holding is limited "'to premises leased for
commercial purposes as distinguished from residential use,'" and "expressly leaving open, for
determination on a case-by-case basis, 'the question whether similar charges under a lease of
residential property would be rent'") (quoting *Garcia*).   *See also Law Offices of Taiwo Agbaje,
P.C. v. JLH Props., II, LLC*, 169 Md. App. 355, 370, 901 A.2d 249, 257-58 (2006) (holding that
attorneys' fees recoverable under a contractual fee-shifting provision in a lease "are not 'rent'
and, therefore, are not recoverable in a R.P. § 8-401 summary ejectment proceeding"),
*legislatively overruled in part by* 2007 Md. Laws ch. 236 (amending R.P. § 8-401(c)(2)(v) to
provide that contractually-shifted attorneys' fees may be awarded in an R.P. § 8-401 proceeding
only in "the case of a nonresidential tenancy").

[42] Depending on the amount in controversy, such a claim could be filed either in state
circuit court or state District Court.   *See generally* C.J. §§ 4-401 (providing that the District

R.P. § 8-402.1, in which the landlord can obtain repossession of the premises only upon demonstrating to the District Court that the tenant's failure to remit the "other charges" is not only a breach of the lease, but is also a "substantial" breach and that it "warrants an eviction." R.P. § 8-402.1(b)(1). *See Brown v. Hous. Opportunities Comm'n of Montgomery County*, 350 Md. 670, 576, 584, 714 A.2d 197, 199, 203 (1998) (holding that R.P. § 8-402.1 vests "discretion in the court to decline a judgment of eviction, even upon a finding of substantial violation, if, in the court's view, the breach does not warrant an eviction," and the District Court is "entitled, and indeed directed, to weigh all of the relevant factors before declaring a forfeiture and evicting the tenant, including the actual loss or damage caused by the violation at issue, the likelihood of future violations, and the existence of effective alternative remedies for past or existing violations").[43]

In comparison to either of those options, a proceeding under R.P. § 8-401 gives substantially greater leverage to the landlord and incentive for payment to the tenant, because of the speed at which the proceeding operates and the fact that the tenant will be swiftly evicted if she fails to pay the amounts found due and owing.[44]  Under the "truncated process" of R.P. § 8-

---

Court has original jurisdiction over an "action in contract or tort, if the damages claimed do not exceed $30,000"); 4-402(d) (providing that the District Court and the circuit courts have concurrent jurisdiction over claims where "the amount in controversy exceeds $5,000"); 4-405 (providing that the District Court has exclusive jurisdiction over a "small claim action," which includes "a civil action for money in which the amount claimed does not exceed $5,000").

[43] R.P. § 8-402.1 does not authorize entry of a money judgment.  *See* R.P. § 8-402.1(b)(1).  Nevertheless, filing a breach of lease action for possession of the premises on the basis of non-payment of "other charges" likely would motivate the tenant to cure the alleged breach by paying the amounts the landlord contends are due.

[44] Ordinarily, a conventional civil suit or a proceeding under R.P. § 8-402.1 would move at a slower pace than a suit under R.P. § 8-401, and provide greater procedural protection to the tenant, including the opportunity for pretrial discovery.  *See Hudson v. Hous. Auth. of Baltimore City*, 402 Md. 18, 28-35, 935 A.2d 395, 400-05 (2007) (holding that parties to a breach of lease proceeding under R.P. § 8-402.1 are entitled to pretrial discovery).  *But see* Md. Rule 3-701(e) (providing that discovery is not available in small claim actions).

401, "the landlord's entitlement to enforcement of his superior interest in the premises is a given, once the failure to pay rent is proven and appropriate notice is provided." *McDaniel v. Baranowski*, 419 Md. 560, 578, 19 A.3d 927, 937 (2011). One could argue that a provision allowing a PHA effectively to use the threat of imminent eviction to coerce payment of "other charges" (which the tenant might dispute) for maintenance, utility charges, and the like is an "unreasonable" lease term, in violation of 42 U.S.C. § 1437d(*l*)(2). On the other hand, one might counter that there is little that is unreasonable or coercive about a provision that allows a tenant to avoid any dispute as to whether she has paid her rent or, instead, some other charge, simply by expressly designating her payment as "rent."

Similarly, perhaps one could argue that the Lease provision regarding allocation of payments constitutes an "unfair or deceptive trade practice" under the CPA for some reason other than the ban on confessed judgment clauses, C.L. § 13-301(12). However, it does not appear that plaintiff has made such an allegation in Count I of her Complaint. Moreover, Count III of plaintiff's Complaint does not expressly invoke either § 1437d(*l*)(2) or the Brooke Amendment, and her fleeting mention of the Brooke Amendment in her Surreply cannot suffice to plead a theory not mentioned in the Complaint and not previously argued by either party. *See, e.g.*, *Arbitraje Casa De Cambio, S.A. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Accordingly, I do not consider the Complaint to have adequately asserted a challenge to the Lease's payment allocation provision under § 1437d(*l*)(2), the Brooke Amendment, or the CPA generally.[45]

---

[45] Plaintiff may move for leave to file an amended complaint asserting such a claim with greater specificity, if she wishes to do so. But, I express no view as to how the Court might rule on such a motion.

### E.  Other CPA Claims

Plaintiff contends that certain other statements made by defendants are "[f]alse . . . or misleading oral or written statement[s] . . . which [have] the capacity, tendency, or effect of deceiving or misleading consumers," C.L. § 13-301(1), in violation of the CPA.  In particular, Ms. Sager alleges two violations of C.L. § 13-301: (1) Ms. Flynn's statements inducing Ms. Sager to sign the Vacate Agreement "by making false oral statements that if the eviction process were carried out, she would not be able to reapply for public housing," Complaint ¶ 47; and (2) the statement in the November 2010 Invoice, that "'If you do not request a hearing as stated above [in accordance with the grievance procedure] you will be deemed to have waived your right to dispute the charges.'"  Complaint ¶ 51 (quoting November 2010 Invoice).  In plaintiff's view, these statements are "[u]nfair or deceptive trade practices" under the CPA.  C.L. § 13-301.

Maryland courts consider two components in analyzing whether a statement violates C.L. § 13-301(1).  A misrepresentation "falls within the scope of C.L. § 13-301(1) if it is 'false' or 'misleading' *and* it has 'the capacity, tendency, or effect of deceiving or misleading' consumers." *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 577, 723 A.2d 502, 510 (emphasis in original), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).  In Maryland, whether a statement is "misleading" is judged from the point of view of a reasonable, but unsophisticated consumer. *See Luskin's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 356-57, 726 A.2d 702, 712 (1999).  In assessing the "capacity, tendency, or effect" of a statement to deceive or mislead, courts consider whether "a significant number of unsophisticated consumers would find [the] information [at issue] important in determining a course of action." *Green v. H & R Block, Inc.*, 355 Md. 488, 524, 735 A.2d 1039, 1059 (1999).  Put another way, a court should ask whether the information is "'important to consumers and, hence, likely to affect their choice.'" *Luskin's*, 353

Md. at 359, 726 A.2d at 713 (citation omitted).  In this respect, a statement "cannot be viewed in a vacuum"; rather, it must be viewed in the context in which it was made, along with other representations to the consumer.  *McGraw*, 124 Md. App. at 580, 723 A.2d at 511.

Defendants urge dismissal of plaintiff's CPA contentions, claiming that the statements at issue, if made, were true and accurate.  *See* Motion at 4-5.  They focus on the first prong of C.L. § 13-301: whether a statement is "false" or "misleading."  With regard to the statement that, if the eviction were carried out, plaintiff would be unable to reapply for public housing, defendants cite federal regulations regarding tenant selection criteria that apply to the public housing program, *see* 24 C.F.R. part 960, subpart B, as well as to the Housing Choice Voucher Program ("Voucher Program"),[46] *see* 24 C.F.R. part 982, subpart L, which it contends permit or require a PHA to deny assistance to a person who has been previously evicted from public housing.[47]

The regulations applicable to the public housing program require PHAs to "establish and adopt written policies for admission of tenants," 24 C.F.R. § 960.202(a)(1), that, *inter alia*, preclude "admission of applicants whose habits and practices reasonably may be expected to have a detrimental effect on the residents or the project environment."  *Id.* § 960.202(a)(2)(iii).  Moreover, the regulations state, at 24 C.F.R. § 960.203(c):

---

[46] The Housing Choice Voucher Program, also known as the "Section 8" program, because of its origin in Section 8 of the Housing Act of 1937 (now codified, as amended, in 42 U.S.C. § 1437f), provides federal subsidies to PHAs to enable program participants to rent housing from private landlords.  Under the program, the PHA pays a "housing assistance payment" to the landlord, which constitutes the difference between the fair market rent for the property and a below-market, income-based contribution by the tenant.  *See generally* 42 U.S.C. § 1437f(*o*).

[47] Defendants also cite to provisions of the Commission's Admissions and Continued Occupancy Policy ("ACOP").  Because the ACOP constitutes a matter outside the pleadings, I have not relied upon the ACOP in reaching my ruling.  I note, however, that the ACOP provisions quoted by defendants in their Motion do not appear to be materially inconsistent with the applicable federal regulations upon which defendants rely.

(c) In selection of families for admission to its public housing program, or to occupy a public housing development or unit, the PHA is responsible for screening family behavior and suitability for tenancy. The PHA may consider all relevant information, which may include, but is not limited to:

(1) An applicant's past performance in meeting financial obligations, especially rent;

(2) A record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences which may adversely affect the health, safety or welfare of other tenants; and

(3) A history of criminal activity involving crimes of physical violence to persons or property and other criminal acts which would adversely affect the health, safety or welfare of other tenants. . . .

Similarly, the regulations for the Voucher Program provide that a PHA may "deny program assistance for an applicant," among other bases, if "any member of the family has been evicted from federally assisted housing in the last five years." 24 C.F.R. § 982.553(c)(1)(ii).

Based on these regulations, defendants argue that "a participant who is terminated from the program is not eligible for participation again for some public housing programs and for others the reason for termination may be relied upon in denying an application."  Motion at 5.  "Conversely," they claim, "if a tenant chooses to vacate in lieu of a termination by the public housing authority, the tenant's record remains clear and their eligibility for participation in public housing or the public voucher program remains unclouded."  Motion at 7.  Therefore, in defendants' view, even if Ms. Flynn made the statement alleged by plaintiff, it was consistent with applicable regulations and thus was "not a false statement," in violation of the CPA.  *Id.*

In focusing on the truth of Ms. Flynn's alleged statement that an eviction would result in Ms. Sager's ineligibility for federally assisted housing, defendants omit that Ms. Flynn also allegedly asserted that, if Ms. Sager vacated her apartment voluntarily, her eligibility for assisted housing would not be affected.  That conclusion is not supported by regulations upon which defendants rely.  Indeed, they suggest the opposite: the regulations instruct a PHA to consider an

applicant's "record of disturbance of neighbors, destruction of property, or living or housekeeping habits at prior residences," 24 C.F.R. § 960.203(c)(2), and to impose policies barring the admission of tenants whose "habits and practices reasonably may be expected to have a detrimental effect on the residents or the project environment." *Id.* § 960.202(a)(2)(iii). There is no indication in the regulations that a PHA is prohibited from considering all of the information available to it, including an applicant's prior record as a tenant. Therefore, even if it is true that Ms. Sager would not be able to reapply successfully for Commission housing if she were evicted, that is insufficient, by itself, to establish as a matter of law that the entirety of Ms. Flynn's representation was true and did not violate the CPA.[48]

With respect to the statement in the November 2010 Invoice that failure to request a grievance hearing would be deemed a waiver of the right to contest the charges, defendants argue that this statement, too, is accurate. In defendants' view, if failure to request a grievance hearing did not result in a waiver, "it would have the effect of rendering the entire grievance process superfluous and a nullity," because "all complainants could avoid any agency action by simply 'not grieving' and not having hearing[s]." Motion at 10.

Defendants are incorrect. As I have already discussed in the context of defendants' administrative exhaustion argument, neither a failure to request a grievance hearing nor an adverse decision in the grievance process results in a waiver of the tenant's right to challenge a PHA's action in court. *See* 24 C.F.R. §§ 966.55(c), 966.57(c).

Defendants' argument, that tenants could prevent a PHA from acting simply by not filing grievances, is misplaced. The applicable regulations provide that "the PHA shall not take the

---

[48] It is also noteworthy that, as alleged by plaintiff, the totality of Ms. Flynn's representations were also intended to induce plaintiff to sign an agreement that purported to relinquish her rights under federal law to notice and the opportunity for a grievance hearing as to HCAAC's proposed termination of her Lease.

proposed [adverse] action until the time for the tenant to request a grievance hearing has expired." 24 C.F.R. § 966.4(e)(8)(ii)(B).  It follows that, once the time to request a grievance hearing has expired, the PHA may take a proposed adverse action.  Nevertheless, under 24 C.F.R. § 966.55(c), the tenant retains her right to "contest the PHA's action . . . in an appropriate judicial proceeding."  There is nothing inconsistent in these regulations, which authorize the PHA to act in the absence of a timely grievance complaint, but do not abrogate the tenant's right to challenge the PHA's action judicially.

Of course, the facts at this juncture are construed in the light most favorable to plaintiff. *See, e.g.*, *LeSueur-Richmond Slate Co. v. Fehrer*, 666 F.3d 261, 264 (4th Cir. 2012).  The statement in the November 2010 Invoice that failure to request a grievance hearing would constitute a waiver of the tenant's right to contest the charges was a misstatement of applicable law.  Therefore, it was "false" or "misleading" within the meaning of C.L. § 13-301(1).[49]

For the foregoing reasons, I decline to dismiss Count I with respect to the two statements analyzed above.  As already discussed, however, Count I's allegation of a violation of the CPA's prohibition of confessed judgments will be dismissed, with prejudice.  To the extent that Count I purports to allege other violations of the CPA, those claims will be dismissed, without prejudice.[50]

---

[49] In rejecting dismissal on the grounds advanced by defendants, I do not conclude that either of the statements challenged by plaintiff violated the CPA as a matter of law.  As indicated, in order to violate C.L. § 13-301(1), a statement must not only be false; it must also have the "capacity, tendency, or effect of deceiving or misleading consumers" when considered in context.  The parties have not addressed the second prong of C.L. § 13-301(1).  Nor do I determine the extent, if any, to which plaintiff sustained actual "injury or loss," which is a predicate to recovery under the private right of action for CPA violations provided in C.L. § 13-408.  *See, e.g.*, *McDaniel*, *supra*, 419 Md. at 587-88, 19 A.3d at 943; *CitaraManis v. Hallowell*, 328 Md. 142, 150-58, 613 A.2d 964, 968-71 (1992).

[50] Although plaintiff's Complaint is vague, it seems to allege additional violations of the CPA.  It states that the Vacate Agreement contains "false and misleading statements including,

## F.  Legal Fees

In Count III, plaintiff alleges that the federal regulations prohibit a PHA from "having a lease provision which obligates the tenant to pay all legal fees regardless of outcome." Complaint ¶ 66.  She contends that the Commission has "charged Ms. Sager numerous legal fees in violation of this provision."  *Id.*

The regulation at issue is found in 24 C.F.R. § 966.6(h).[51]  Issued by HUD pursuant to the Congressional ban on "unreasonable terms and conditions" in public housing leases, 42 U.S.C. § 1437d(*l*)(2), this regulation bars the following type of provision in a public housing lease:

> (h) *Tenant chargeable with cost of legal actions regardless of outcome.*  Provision that the tenant agrees to pay attorney's fees or other legal costs whenever the landlord decides to take action against the tenant even though the tenant prevails in the action.  Prohibition of this type of provision does not mean that the tenant as a party to the lawsuit may not be obligated to pay attorney's fees or other costs if he loses the suit.

---

but not limited to, a statement regarding the document's compliance with state law and Ms. Sager's lease; and an assertion that 'If [Ms. Sager] should violate this agreement" the Commission would proceed "with the filing of a PETITION—WARRANT OF RESTITUTION with the courts to move forward and accomplish the eviction process with the Sheriff." Complaint ¶ 48.  Plaintiff also contends that the Commission has "issued various other documents with false statements." *Id.* ¶ 51.  To the extent that these contentions do not identify particular alleged false or misleading statements, or give any indication as to why the alleged statements had "the capacity, tendency, or effect of deceiving or misleading consumers," C.L. § 13-301(1), the claims are mere "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement,'" that do not suffice to state a claim under federal pleading requirements. *Iqbal, supra*, 129 S. Ct. at 1949 (quoting *Twombly, supra*, 550 U.S. at 555-57).

To the extent that plaintiff's claim regarding the "PETITION—WARRANT OF RESTITUTION" is that the Commission would not actually have been entitled to seek a warrant of restitution unless and until it obtained a judgment of possession from the District Court, this is a mere inaccuracy in terminology that, without more, cannot rise to the level of a violation of the CPA; there is no indication or allegation that the statement had the "capacity, tendency, or effect of deceiving or misleading" plaintiff as to the Commission's intention to seek eviction if she did not comply with the Vacate Agreement.

[51] Plaintiff's Complaint cites the non-existent "24 C.F.R. 966.66(h)" but, as defendants recognize, this is obviously a typographical error.

Defendants argue that this claim should be dismissed because the Commission "has not charged Plaintiff attorneys' fees in those cases where it has not prevailed." Motion at 19. They also state: "HCAAC even credited Plaintiff back for those fees where the Court has not yet reached a decision in its favor." *Id.*

The facts, as alleged in plaintiff's Complaint and her exhibits, are that the Commission applied charges to Ms. Sager's account in the amount of the filing fees and service fees for the First Rent Case ($17) and the Breach of Lease Case ($78). The charges were applied to Ms. Sager's account contemporaneously with the Commission's initiation of the relevant state District Court cases, before any determination could have been made as to whether the Commission was the prevailing party. Indeed, Ms. Sager ultimately prevailed in each case.

Section 966.6(h) effectively prohibits charging a tenant for legal fees when suit is filed because, at that time, it cannot be known whether the PHA will prevail. A PHA is only permitted to collect costs under the regulation when the PHA is the prevailing party. Therefore, plaintiff's Complaint adequately alleges a violation of 24 C.F.R. § 966.6(h).

To be sure, under the facts alleged, the Commission subsequently cured the violations by crediting the charges back to Ms. Sager. Without more, however, that does not vitiate or render moot Ms. Sager's claim for declaratory relief.[52] "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' '[I]f it did, the courts would be compelled to leave "[t]he defendant . . . free to return to his old ways."'" *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal citations omitted). Therefore, a "'defendant claiming that its voluntary compliance moots a case bears a formidable burden of showing that it is absolutely

---

[52] Notably, defendants have not conceded that application of the charges to plaintiff's account was prohibited.

clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"
*McBurney v. Cuccinelli*, 616 F.3d 393, 404 n.10 (4th Cir. 2011) (internal quotation marks and citation omitted).

At this juncture, defendants have not shown, nor have they even asserted, that the violations of 24 C.F.R. § 966.6(h) alleged by plaintiff cannot reasonably be expected to recur. Accordingly, their Motion will be denied as to this claim.

### G.  Grievance Process

Plaintiff also challenges several aspects of the Commission's grievance process, as it was applied to her.  These claims are asserted in Count III of the Complaint, under the Housing Act and its implementing regulations.  Plaintiff contends that the Commission violated the applicable statutory and regulatory requirements by "failing to provide a written decision that provided the reasons for terminating Ms. Sager's housing," by "demonstrating the appearance of bias in the hearing officer by submitting documentary evidence that appears to have been sent to the hearing officer prior to the hearing," and by "using the informal hearing officer as a primary witness in the formal hearing."  Complaint ¶ 67.

These claims also form the basis of Count V of plaintiff's Complaint, which alleges deprivation of due process of law under the Fourteenth Amendment.  Ms. Sager does not suggest that the Fourteenth Amendment requires any process other than the grievance process under the regulations, nor does she allege that her constitutional claim entitles her to any greater or different relief than Count III.  Accordingly, I will consider her claims in the context of the Housing Act and its regulations.

As noted, courts have held that tenants have a right enforceable under 42 U.S.C. § 1983 to grievance hearings that are conducted in accordance with the Housing Act and its

implementing regulations.  *See, e.g.*, *Farley v. Philadelphia Hous. Auth.*, *supra*, 102 F.3d 697, 702-04 (3d Cir. 1996); *Mananioba v. Fairmont Hous. Auth.*, *supra*, 922 F.2d 836 (4th Cir. Jan. 14, 1991) (unreported) (per curiam); *Samuels v. District of Columbia*, *supra*, 770 F.2d 184, 197 (D.C. Cir. 1985); *Conway v. Hous. Auth. of City of Asheville*, *supra*, 239 F. Supp. 2d 593, 598-600 (W.D.N.C. 2002).  Although the formal rules of evidence do not apply at a grievance hearing, *see* 24 C.F.R. § 966.56(f), the complainant has the rights to counsel, to present evidence, and to confrontation.  *See id.* § 966.56(b); *see also* 42 U.S.C. § 1437d(k)(3)-(5).

Other features of the process are also relevant.  The regulations require a formal grievance hearing "by an impartial person or persons appointed by the PHA, other than a person who made or approved the PHA action under review or a subordinate of such person."  24 C.F.R. § 966.55(b)(1); *see also* 42 U.S.C. § 1437d(k)(2).  However, a hearing officer may be "an officer or employee of the PHA."   24 C.F.R. § 966.55(b)(2)(ii).  The PHA's method of selection of hearing officers or panel members must be specified in the PHA's grievance procedure.  *Id.* § 966.55(b)(2).  HUD permits hearing officers and panel members to be selected either by vote of the tenants, *see id.* § 966.55(b)(2)(i), or by appointment by the PHA, with the input of resident organizations.  *See id.* § 966.55(b)(2)(ii), (b)(3).

A formal grievance hearing must result in a "decision based solely and exclusively upon the facts presented at the hearing."  *Id.* § 966.56(b)(5).  Of import here, the hearing officer or panel must "prepare a written decision, together with the reasons therefor," which must be "sent to the complainant and the PHA."  *Id.* § 966.57(a); *see also* 42 U.S.C. § 1437d(k)(6).

One of plaintiff's claims in Count III lacks merit.  She challenges the Commission's use of "the informal hearing officer as a primary witness in the formal hearing."  Complaint ¶ 67. However, plaintiff does not further elucidate the basis for this claim, nor does she explain how

the testimony of the informal hearing officer could have violated her federal rights.  It is not a *per se* violation of the regulations for the person who conducted the "informal grievance hearing," or meeting for informal settlement of grievance, under 24 C.F.R. § 966.54 to testify and provide evidence at a formal grievance hearing.  Without more specificity as to the exact nature of the alleged violation, this aspect of plaintiff's claim does not state a claim upon which relief can be granted, and will be dismissed.

However, plaintiff's other challenges to the grievance procedure withstand defendants' Motion.  Under the facts as alleged by plaintiff in her Complaint and supporting exhibits, the written decision sent to plaintiff stated only that "the decision of the Housing Commission of Anne Arundel County was upheld as a result of the hearing."  Ex.3 to Complaint; *see also* Complaint ¶ 23.  The decision did not provide even a minimal statement of the hearing panel's reasons for its decision.  This plainly does not comport with the requirement that the written decision emanating from a grievance hearing must contain "the reasons therefor."  24 C.F.R. § 966.57(a).

Even if I can consider the "Hearing Summary" from the hearing, *see* note 9, *supra*, despite the fact that it was not included with plaintiff's Complaint, the "Hearing Summary" does not defeat plaintiff's claim for the following reasons.  First, there is no allegation or indication that the Hearing Summary was sent to Ms. Sager.  Thus, the Hearing Summary cannot suffice as the "written decision" of the hearing panel, containing the "reasons therefor," which must be "sent to the complainant."  24 C.F.R. § 966.57(a).  Second, the content of the Hearing Summary contains very little in the way of "reasons," so as to satisfy the requirements of 24 C.F.R. § 966.57 and due process.  Indeed, what little content there is raises additional concerns regarding plaintiff's allegations of disability discrimination.

The Hearing Summary consists of a printed form that has partially been completed by hand.  A checked box indicates that the "Decision" is "Approved."  ECF 8-4 at 58.  In the section labeled "Reasons: The panel gives the following summary of it's [sic] reasons supporting its decision," the Hearing Summary states: "It has been established at the hearing that the Resident has [f]ailed to do the following: *Be coherent on a reg. basis* [illegible] *May problems from* [illegible]."  ECF 8-4 at 58 (italics indicate handwritten matter).   Another box is checked affirming the statement that the "facts referred to above constitute a breach by the Resident of the resident's lease agreement entitling the Commission to the relief requested and hereby approved by the decision."  ECF 8-4 at 59.  There is no discussion of the evidence presented at the hearing or the reasons why that evidence supported the Commission's decision.

The Hearing Summary provides little more than an incomprehensible sentence fragment, which does not amount to adequate "reasons" for the decision.  24 C.F.R. § 966.57(a).  Indeed, the sentence fragment indicates that the panel based its decision not on any particular acts of misconduct by Ms. Sager, but on her failure to be "coherent on a reg[ular] basis."  Yet, there is no provision in the Lease establishing "coherence" as an obligation of the Tenant.  And, to the extent that Ms. Sager's alleged failure to be "coherent" was a symptom of her disability, the Hearing Summary failed to consider the potential for reasonable accommodation of Ms. Sager's disability.   Accordingly, even if I can consider the Hearing Summary, it does not defeat plaintiff's claim.

Finally, plaintiff alleges that an "Incident Inquiry Report" (which has not been submitted as an exhibit) that was entered into evidence at the hearing bore a fax header indicating that it had been faxed to "JohnH."  In her view, this raised a question as to whether the hearing officer, John Harris, had received the document on an *ex parte* basis, thereby calling into question

whether Mr. Harris was "impartial," 24 C.F.R. § 966.55(b)(1), and able to render a decision "based solely and exclusively upon the facts presented at the hearing." *Id.* § 966.56(b)(5). Defendants argue that this claim fails because "the three person hearing panel, not the hearing officer, reached the decision." Motion at 18. However, they cite no authority for this proposition, and the role of the hearing officer in the process appears to be a question of fact that I cannot resolve at the motion to dismiss stage.

More broadly, defendants argue that Ms. Sager's arguments regarding the grievance procedure are "premature" because, at the time the Motion was submitted, the "termination ha[d] yet to occur." Motion at 18. In their view, if plaintiff's "termination comes to pass, it will be as a result of a lengthy trial" in the Breach of Lease Case, in which Ms. Sager will receive a full panoply of due process protections. *Id.* at 19. To the extent that the Commission argues that the due process protections attendant at a trial in a breach of lease case in state court can cure any procedural deficiencies in a prior grievance proceeding, I disagree. Rather, I find persuasive the conclusion of the federal court in the Western District of Washington when faced with similar arguments. In *Shepherd v. Weldon Mediation Services, Inc.*, 794 F. Supp. 2d 1173 (W.D. Wash. 2011), that court found that the refusal of a PHA's hearing officer to consider "legal arguments" in grievance proceedings violated the tenants' federal rights. It said, *id.* at 1183-84:

> [The PHA] violates the law even though tenants have judicial options for challenging grievance decisions. [The PHA's] reliance on judicial review as an excuse for inadequate grievance procedures is without merit. The same argument would permit [the PHA] to dispense with grievance proceedings entirely, simply because tenants would be able to sue. The existence of a Congressionally-mandated grievance procedure is proof enough that Congress did not think judicial remedies alone were adequate to address landlord-tenant disputes in the public housing context.

Accordingly, I decline to dismiss plaintiff's claims alleging deficiencies in the grievance process on the grounds advanced by defendants. I am cognizant, however, that the

state court Breach of Lease Case apparently has now concluded in Ms. Sager's favor.  Although

the record is inadequate for me to determine the effect of this outcome on plaintiff's claims here,

it may well be that the decision in the state Breach of Lease Case has rendered moot plaintiff's

claims, at least in certain respects (*e.g.*, damages).   However, as with plaintiff's contention

regarding the Commission's assessment of legal fees, a claim is not moot if there is no assurance

that the challenged actions will not recur.   Moreover, it may be that the state court considered

and resolved plaintiff's contentions regarding procedural deficiencies in the grievance

proceedings, thereby potentially calling into play concerns of *res judicata*, collateral estoppel, or

the *Rooker-Feldman* doctrine.   Because I lack any information in the record as to the decision of

the state court in the Breach of Lease Case, it would be premature to resolve these questions at

this juncture.

## H.  Disability Discrimination

Plaintiff alleges that defendants discriminated against her on the basis of her alleged

disability by refusing "to make a reasonable accommodation in its rules, policies, practices and

services, as necessary to afford Ms. Sager equal opportunity to enjoy her apartment dwelling."

She asserts this claim in Count IV, under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*[53]

Among other things, the FHA "protects people with disabilities against discrimination in

housing."   *Bryant Woods Inn, Inc. v. Howard County*, 911 F. Supp. 918, 928 (D. Md. 1996),

*aff'd*, 124 F.3d 597 (4th Cir. 1997).   Discrimination on the basis of disability or, in the words of

---

[53] In Count III, plaintiff also appears to assert that the Commission's alleged failure reasonably to accommodate her disability violated the regulations under the Housing Act that require housing designated for the elderly and persons with disabilities to conform "in particular" with the nondiscrimination requirements of the FHA.  24 C.F.R. § 945.301.  To that extent, the analysis in this section applies equally to Count III and Count IV.

the FHA, on the basis of "handicap,"[54] is prohibited by 42 U.S.C. § 3604(f).  In relevant part,

that statute provides that "discrimination includes . . . a refusal to make reasonable

accommodations in rules, policies, practices, or services, when such accommodations may be

necessary to afford [a] person [with a handicap] equal opportunity to use and enjoy a dwelling."

42 U.S.C. § 3604(f)(3)(B).  Courts "have uniformly concluded that the standards for 'reasonable

accommodations' developed under § 504 of the Rehabilitation Act also apply to

§ 3604(f)(3)(B)." *Bryant Woods*, 911 F. Supp. at 940 (citing cases).  In "considering whether a

proposed accommodation is mandated by the Fair Housing Act, a court must balance the

plaintiff's interest in equal housing opportunity against the defendant's interest in the integrity of

the scheme to be affected by the decision." *Id.* at 941.  Whether an accommodation is reasonable

is ultimately a question of fact. *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir.

1994) (considering reasonable accommodation standard in case arising under § 504 of the

Rehabilitation Act).

Defendants seek summary judgment as to this claim, contending that the "undisputed

facts show that Plaintiff has not identified that she was entitled to a reasonable accommodation

or that HCAAC's offer of a reasonable accommodation was deficient under Federal law."

Motion at 14.  With respect to Ms. Sager's March 2011 Transfer Request, which was submitted

as Exhibit 4 to the Complaint, the Commission correctly asserts that nowhere in the request

---

[54] The FHA, in 42 U.S.C. § 3602(h), provides the following definition of "handicap":

"Handicap" means, with respect to a person—

   (1) a physical or mental impairment which substantially limits one or more of
   such person's major life activities,

   (2) a record of having such an impairment, or

   (3) being regarded as having such an impairment,

but such term does not include current, illegal use of or addiction to a controlled
substance.

(which Ms. Sager apparently completed without the assistance of counsel) did Ms. Sager request an accommodation on the basis of disability.  Indeed, although the transfer request was submitted on a form that contains a checkbox to request an accommodation on the basis of a "disability or handicap," Ms. Sager did not check the box.  Instead, she checked a box marked "Other" as the basis for her request, and wrote that she "feels physical safety is in jeopardy under constant surveillance from staff and feels harassed by staff and other tenants.  Not compatible with present community."  ECF 2-4 at 1.  As a matter of law, this request was not a request for a reasonable accommodation under the FHA.  To the extent that plaintiff's claim is based on this request, it fails to state a claim upon which relief can be granted.

However, as noted, later in March 2011, plaintiff's counsel submitted a letter to the Commission's counsel that expressly requested an accommodation on the basis of disability.  *See* Ex.9 to Complaint.  Defendants claim that their attorney responded to this request with a counter-offer of a reasonable accommodation, "by which [Ms. Sager] would agree to have a full time live-in-aid [sic] reside with her, would continue complying with her medical care as recommended by her mental healthcare, and would remain bound by all other material terms of her housing contract."  Motion at 16.  They also claim that they offered to relocate Ms. Sager to a larger public housing unit that could accommodate both her and a full-time aide, or to provide her with a voucher through the Housing Choice Voucher Program that would give her a subsidy to rent to such a unit from a private landlord.  *Id.* at 17.  According to defendants, Ms. Sager rejected this offer.  *Id.*

In this connection, defendants have submitted two letters from the Commission's counsel to Ms. Sager's counsel, outlining this offer of accommodation.  *See* Ex.F & Ex.G to Martin Aff. (ECF 8-4 at 75-79, ECF 8-5 at 1-4).  But, these letters constitute matters outside of the pleadings

that cannot be considered unless the Court considers the Motion on a summary judgment basis, pursuant to Fed. R. Civ. P. 12(d) and 56.  In my view, it would be inappropriate, at this juncture, to render judgment on the fact-intensive issue of whether the Commission's offer constituted a reasonable accommodation.  As noted, the record as to the disposition of the Breach of Lease Case is not yet before me, and plaintiff expressly asserts that she raised the issue of reasonable accommodation as a defense in that case.  *See* Surreply at 3-4.

To be sure, as plaintiff points out, the District Court was not necessarily required to resolve the reasonable accommodation issue in the Breach of Lease Case, because plaintiff also presented other defenses.  Moreover, in the absence of an affirmative counterclaim for damages, the District Court could not have afforded her complete relief as to her FHA claim.[55]

Nevertheless, to the extent that the District Court considered and resolved Ms. Sager's reasonable accommodation defense, her FHA claim in this lawsuit may be subject to considerations of *res judicata*, collateral estoppel, mootness, or the *Rooker-Feldman* doctrine. Until the record of the District Court's decision in the Breach of Lease Case is placed before me, I decline to resolve defendants' arguments for summary judgment as to Count IV.  Therefore, defendants' Motion as to Count IV (and Count III, to the extent it implicates a reasonable accommodation claim) will be denied, without prejudice to the defendants' right to renew their arguments based on a complete record.

## I.  Official Capacity Claims

Defendants also argue that plaintiff's claims against Mr. Martin and Mr. Flynn should be dismissed.  In support, they cite a single decision from this district, *Pathways Psychosocial v. Town of Leonardtown*, 133 F. Supp. 2d 772, 780 (D. Md. 2001), which applied the doctrine

---

[55] It is also salient that the District Court of Maryland has no jurisdiction to issue declaratory judgments.  *See* C.J. § 4-402(c).

announced by the Supreme Court in *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989), to the effect that states and state agencies are not "persons" that are subject to suit for money damages under § 1983.

The aspect of *Will* upon which defendants rely is the *Will* Court's extension of its holding to state officials sued in their official capacities. The Court said: "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Id.* at 71. However, the *Will* doctrine is subject to a significant exception, which is relevant here. The *Will* Court stated that § 1983 actions for prospective relief, such as declaratory judgment, may proceed against state officials in their official capacities. *See id.* at 71 n.10 (citing, *inter alia*, *Kentucky v. Graham*, 473 U.S. 159 (1985), and *Ex parte Young*, 209 U.S. 123 (1908)); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (holding that declaratory relief, even as to the legality of past action, is "prospective" for purposes of *Ex parte Young*, and thus may be obtained against state officials sued in their official capacities). Thus, even if the *Will* doctrine applied to this case, it would not bar plaintiff's declaratory claims.

But, more important, defendants' argument overlooks a major premise: in order for *Will* to apply, I would need to determine that the Commission is a state agency for purposes of § 1983 liability, and that, consequently, its officials are *state* officials. In contrast to state agencies, local and municipal governments are "persons" that "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief." *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).[56] Therefore, unlike state officials, "local government officials sued in their official

---

[56] The *Monell* Court also held that *respondeat superior* does not apply in the § 1983 context, and therefore a municipal or local government can only be sued directly under § 1983

capacities are 'persons' under § 1983 in those cases in which . . . a local government would be suable in its own name," and are subject to suit.  *Id.* at 690 n.55.

For purposes of liability under state law, housing authorities in Maryland are ordinarily considered local government agencies, not state agencies.  *See, e.g.*, *Mitchell v. Hous. Auth. of Baltimore City*, 200 Md. App. 176, 189-90, 26 A.3d 1012, 1020, *cert. denied*, 423 Md. 452, 31 A.3d 920 (2011).  Moreover, although the Court is unaware of a case expressly deciding whether Maryland housing authorities are state agencies, it is by no means unprecedented for Maryland housing authorities to be sued under § 1983.  *See, e.g.*, *Dorsey v. Hous. Auth. of Baltimore City*, *supra*, 984 F.2d 622; *Vance v. Hous. Opportunities Comm'n of Montgomery County*, 332 F. Supp. 2d 832 (D. Md. 2004); *Diggs v. Hous. Auth. of City of Frederick*, *supra*, 67 F. Supp. 2d 522.  In any event, defendants have not cited any authority for the proposition, nor have they asserted that the Commission is a state agency that is not subject to suit under § 1983.  Further, they have not expressly claimed that Mr. Martin and Ms. Flynn are state officials.  In the absence of a demonstration that Mr. Martin and Ms. Flynn are state officials, the fact that they have been sued only in their official capacities does not compel dismissal of the claims against them.

## Conclusion

For the foregoing reason, defendants' Motion will be granted in part and denied in part. In particular, plaintiff's claim for treble damages and her claims that defendants have violated prohibitions on confessed judgments also will be dismissed, with prejudice.  This disposes of Count II in its entirety, and parts of Counts I and III.  The Motion will be denied with respect to plaintiff's allegations in Count I concerning the allegations that Ms. Flynn induced plaintiff to

for a governmental custom or policy that violates federal rights; it is not vicariously liable for any and all unconstitutional conduct of its agents.  *See Monell*, 436 U.S. at 490-95.  Such a claim against a locality or municipality, based on an official policy or custom that causes a violation of the plaintiff's federal rights, is commonly called a "*Monell* claim."  *E.g.*, *Walker v. Prince George's County*, 575 F.3d 426, 431 (4th Cir. 2010).

sign the Vacate Agreement and as to the Commission's assertion in the November 2010 Invoice that failure to request a grievance hearing would waive plaintiff's right to contest the charges.  In all other respects, Count I will be dismissed, without prejudice.  The Motion will be denied with respect to plaintiff's remaining allegations in Count III and Count V regarding the charging of legal fees and procedural deficiencies in the grievance proceeding, except that plaintiff's claim as to the testimony of the informal hearing officer will be dismissed, without prejudice.  The Motion will also be denied as to Count IV (and Count III, to the extent it alleges a denial of reasonable accommodation as to disability), except that any claim of disability discrimination in connection with the denial of plaintiff's March 2011 Transfer Request will be dismissed. Plaintiff's remaining claims against Mr. Martin and Ms. Flynn in their official capacities are not dismissed.  An Order implementing these rulings follows.


Date:   April 11, 2012                        _____/s/_____
                                              Ellen Lipton Hollander
                                              United States District Judge